Eddie James **JOHNSON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 70177.

Court of Criminal Appeals of Texas, En Banc.

Nov. 21, 1990.

Rehearing Overruled Feb. 13, 1991.

William G. Walston, Jr., Rockport, Carl E. Lewis, Corpus Christi, for appellant.

Thomas L. Bridges, Dist. Atty. and Michael E. Welborn and John S. Gilmore, Asst. Dist. Attys., Sinton, Robert Huttash, State's Atty., Austin, for the State.

OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. TEX. PENAL CODE ANN. § 19.03(a)(6)(A) [1]. After finding the appellant guilty, the jury returned affirmative findings to the special issues under Article 37.071, TEX.CODE CRIM.PROC. Punishment was assessed at death.

Appellant raises twelve points of error. He challenges: the trial court's denial of appellant's pre-trial motion to suppress evidence seized during a search of his trailer house; the trial court's permitting the State to call his wife to the stand as a witness, and in the presence of the jury forcing her to claim her privilege to not testify against her husband; the introduction of his wife's testimony taken during a pre-trial hearing; the admission into evidence of cocaine seized during the search of appellant's trailer; the admission of evidence (appellant's blood and analysis of his blood) seized pursuant to a search warrant; the admission of hearsay testimony from a witness regarding statements made by a victim; the admission of prior grand jury testimony to impeach a witness; the admission, during the punishment phase, of photographs depicting the appellant's murdered brother; and finally, the sufficiency of the evidence to sustain his conviction for capital murder. We will affirm.

On the morning of September 29, 1987, Deputy Sheriff Jerry Hutson discovered the body of an Hispanic female near Johnson Road in Aransas County. The victim appeared to have been dragged down the road and had also suffered two gunshot wounds to the head. Responding to Officer Hutson's call for assistance, Deputy Sheriff William Spaulding arrived at the scene and promptly discovered the bodies of a white male and a young Hispanic girl a

---

1. § 19.03(a)(6)(A), Capital Murder, states in pertinent part:

 (a) A person commits an offense if he commits murder as defined under Section 19.-02(a)(1) of this code and:

 * * * * * *

 (6) the person murders more than one person:

 (A) during the same criminal transaction;
 Appellant was indicted, tried, and convicted for the murders of Virginia Cadena and Elizabeth Galvan.

short distance from the first body. The bodies were later identified as Virginia Cadena, her ten year old daughter Elizabeth Galvan, and David Magee, who had lived with Cadena and Galvan for several years. Magee's feet were bound together with a double strand of wire looped twice around the ankles. Magee's hands were tied behind his back with a long telephone cord. Cadena and Galvan had not been bound.

Dr. Joseph Rupp, Medical Examiner for Nueces County, performed autopsies on the three bodies. According to Rupp's testimony, Cadena died as a result of two gunshot wounds to the head, Galvan died as a result of four gunshot wounds to the abdomen, and Magee died as a result of a gunshot wound to the head. The victims, however, had suffered other gunshot wounds. Rupp was of the opinion that Cadena and Magee had been shot with a .38 caliber weapon, and that Galvan had been shot with a .25 caliber weapon. A drug screen test on Magee's body showed that Magee had cocaine and heroin in his system. Rupp also observed a faint needle mark on Magee's right forearm.

Captain Dean Smith of the Aransas County Sheriff's Department was in charge of the investigation into the deaths of Cadena, Galvan and Magee. After completing work at the Johnson Road site, Smith and other officers continued their investigation at 118 Jackson Square Apartments, the residence of the victims. The victims' apartment had been ransacked. A bloody struggle appeared to have occurred in the apartment. Inside the apartment officers found: wire and cord from a telephone similar to that used to bind Magee's hands and feet; a spent .38 caliber bullet; a Budweiser beer can with appellant's fingerprints on it; and a telephone with the cord removed and with appellant's fingerprints on it. The blood found in the apartment was determined to be that of David Magee.

Cadena's car was discovered by employees of the Aransas Pass Nursing Home in the parking lot of the nursing home, approximately two blocks from appellant's trailer home in the Portobello Village trailer park. Investigating officers found blood in the interior of the car, which was determined to be that of the victims. Cadena's blood, hair and tissue were found on the undercarriage of the car, indicating that Cadena had been struck and dragged underneath the car. Officers also found a crushed Coke can between the driver's seat and the console. A palm print on the can had been made by a person holding the can with blood on their hand. Analysis revealed that the palm print was appellant's. Officers also found six .25 caliber semi-automatic casings inside the car. In addition, blood drippings were discovered on the ground leading from the car in the direction of appellant's trailer park.

On the roof of the nursing home, officers found a blood soaked towel and the warm-up top that Cadena had been wearing before she was murdered. In a dumpster behind the nursing home, officers found a bloody Budweiser beer can, bloody socks and some blood-soaked rags. In a dumpster at the trailer park, officers found a pair of size 38–34 Wrangler blue jeans and a pair of Fruit of the Loom Golden Blend underwear. On the jeans, officers found Negroid hairs, similar to appellant's hair. The jeans and the underwear had been soaked in blood but had been later washed and were soaking wet when found.

Pam Meistobach, a co-worker of Cadena, learned that Cadena, Galvan and Magee had been murdered. Meistobach supplied officers with information concerning appellant's relationship with Cadena and Magee. She further told officers that she suspected that appellant had committed the murders. Upon hearing this, officers made appellant their primary suspect. At trial, Meistobach testified that both appellant and Magee had told her that they did not get along with each other. Meistobach had observed hostile confrontations between appellant and Cadena, where appellant told Cadena "Tell your old man to shut up and you're causing me problems" and "Well, you don't think I will do anything, but I will."

On September 29, officers obtained a warrant for appellant's arrest. Officers

surrounded appellant's trailer home. Inside the trailer were appellant and his stepson Michael. Appellant's wife, Elaine Johnson, was not living in the trailer at that time, due to marital difficulties. Officers ordered appellant out of his trailer. Appellant complied and was arrested. Appellant and Michael were transported to the police station. Appellant refused to consent to a search of the trailer. At the time of his arrest, appellant had a cut between the thumb and index finger of his right hand. This cut was later shown to be consistent with the type of cut that can be caused by the slide recoil when a .25 caliber semi-automatic pistol is fired.

On October 1, Elaine Johnson gave consent to search her and appellant's trailer to Linda Thompson of the Aransas Pass Police Department. Officers searched the trailer on October 1 and found a pair of appellant's work boots which were splattered with human blood. Later analysis revealed that the blood splatter pattern on the work boots matched the pattern on the Wrangler jeans found in the dumpster. Officers also found, in appellant's bedroom, a pair of Fruit of the Loom Golden Blend underwear of the same size as the pair found in the nearby dumpster. A holster with the initials "J.R." was found underneath the vacant trailer next to appellant's trailer. The holster was later identified by Jerry Ramsey as the holster to his .38 caliber revolver. The revolver and holster had been stolen from his vehicle several weeks before the murders. Taped with duct tape to bottom of the electric meter box for appellant's trailer, officers found a packet containing cocaine. Officers also seized the following items from appellant's trailer: a gun cleaning kit suitable for a .38 caliber pistol; a gun cleaning kit suitable for a .25 caliber pistol; a roll of silver duct tape; and a photograph of appellant sitting on a horse holding a can of Budweiser beer in his left hand.

At trial, Arturo Riojas testified that he had owned a .25 caliber semi-automatic pistol and that the .25 caliber pistol had been stolen during a burglary of his residence approximately one year before the trial. Riojas' stepson, Gilbert Davilla, testified that he had taken the .25 caliber pistol during a burglary of Riojas' residence and had given the pistol to Dionicio Pena to sell. Pena testified that he sold the pistol to appellant. Theresa Holmes testified that appellant had offered to sell her a .22 or .25 caliber pistol approximately one week before the murders were committed. Before the grand jury, Holmes testified that appellant had offered to sell her a .38 caliber pistol. At trial, Holmes repudiated her grand jury testimony regarding the .38 caliber pistol. No .38 caliber pistol was ever found.

The .25 caliber pistol was found approximately one week after the murders were committed, near a roadway close to the spot where the victims' bodies were discovered. Charles Parker, a civilian ballistics expert with the Corpus Christi Police Department, tested two bullets removed from Galvan's body and determined that they had been fired from the .25 caliber pistol that appellant had bought from Pena.

At trial, Patricia Hulen and Roxanna Payne, Department of Public Safety forensic serologists, testified as to several aspects of the physical evidence. In summary, their testimony indicated that: the wires used to bind the hands and feet of Magee had been ripped from the telephone in the victims' residence; the underwear and jeans found in the dumpster and the boots found in appellant's trailer had been washed; the jeans contained blood consistent with that of Cadena and Magee; body hairs found on the jeans and underwear were consistent with those of Cadena and Magee; appellant's boots contained blood consistent with that of Magee.

Diane Leucht, a former co-worker of appellant and Magee at Grasso Oilfield Services, testified as to the work relationship of appellant and Magee. Appellant had been working as a "yard man" at Grasso for several months before Magee was hired as "yard foreman." Appellant apparently was upset that he had not been promoted to foreman and blamed Magee. Appellant repeatedly refused to follow Magee's orders and made threats to "get even with Magee." Approximately one month after

Magee was hired, appellant was fired, because he had "bugged" Leucht's office. Appellant then filed a lawsuit against Grasso claiming racial discrimination. Magee assisted appellant in his lawsuit, but apparently this assistance was not given voluntarily as Magee "was afraid of" appellant.

Steven Hoskins, manager of the Portobello Village trailer park, testified that on the evening after the murders were committed he watched as appellant got out of a taxicab, went to a dumpster near appellant's trailer, and put a bag of trash in the dumpster. This was somewhat unusual as Hoskins normally saw appellant's stepson Michael take the family trash to the dumpster.

Johnny Goff, a taxicab driver, testified that on September 28, 1987 at 6:30 p.m. he picked up appellant at his trailer park and took him to a convenience store next to the Jackson Square Apartments, where the victims resided. Appellant was wearing a "fairly new" pair of blue jeans at that time. Appellant did not pay Goff for the fare at that time. Appellant paid Goff thirteen dollars the next day for that fare and for another that appellant owed him.

Appellant's wife, Elaine Johnson, testified on direct and cross-examination at a pre-trial hearing on appellant's motion to suppress evidence. In short, Ms. Johnson testified that approximately three weeks prior to September 29, she purchased a new pair of Wrangler blue jeans, size 38–34, for appellant, because he had gained weight. After Ms. Johnson invoked her spousal privilege to not testify against her husband at trial[2], the State introduced, over objection, portions of her testimony from the pre-trial hearing relating to her purchase of the blue jeans.

Appellant called nineteen witnesses in his defense. Appellant's stepson, Michael Johnson, testified that appellant left their trailer on September 28, 1987 between six and seven p.m. and returned between nine and ten p.m., and that appellant went to sleep between ten thirty and eleven thirty p.m. Michael further testified that appellant owned a .25 caliber handgun. However, Michael testified that the .25 caliber Titan handgun identified by ballistics expert Parker as the weapon used to kill Galvan, was not the same handgun that he remembered as being owned by appellant.

Jerry Rogers, who lived in the Jackson Square Apartments, testified that on September 28 between ten thirty and eleven p.m. he heard what sounded like one gunshot come from the direction of the victims' apartment. Rogers watched the victims' apartment from his front window for almost four more hours, but never observed anyone enter or leave and saw nothing unusual. Rogers claimed to have telephoned the Aransas Pass Police to report the gunshot, but police never responded to his telephone call and there was no record of his call.

Several other defense witnesses testified as to the work relationship between appellant and Magee, all stating that they had observed no hostility or disagreement between appellant and Magee.

In his twelfth point of error, appellant challenges the sufficiency of the evidence to show appellant's guilt beyond a reasonable doubt. Appellant argues that Michael Johnson's testimony that appellant returned to his trailer before ten p.m. on September 28 and Jerry Rogers testimony that he heard a single gunshot coming from the direction of the victims' apartment between ten thirty and eleven p.m. that night, shows that it would have been impossible for appellant to have been both in his trailer and at the victims' apartment when Rogers heard the gunshot.

The standard of review for sufficiency of the evidence in a criminal case is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 n. 12, 99 S.Ct. 2781, 2789 n. 12, 61 L.Ed.2d 560 (1979); *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Cr.App. 1981). Circumstantial evidence should not

---

2. TEX.R.CRIM.EVID. 504(2)(a). See note 4.

be tested by a different standard of review than direct evidence. The *Jackson v. Virginia* standard is correct for evaluating both direct and circumstantial evidence. *Wilson v. State,* 654 S.W.2d 465, 471 (Tex. Cr.App.1983) (opinion on rehearing). However, a conviction based on circumstantial evidence cannot be sustained if the evidence does not exclude every *reasonable* hypothesis other than the guilt of the defendant. Proof which amounts to only a suspicion or probability of guilt is insufficient. In addition, each circumstantial evidence case must be evaluated by the particular facts of that case to determine the sufficiency of the evidence to support a finding of guilt. *Johnson v. State,* 673 S.W.2d 190, 195 (Tex.Cr.App.1984).

■ The State's case against appellant was made through circumstantial evidence. Nevertheless, we find that the evidence when viewed in the light most favorable to the verdict is sufficient to support appellant's conviction for capital murder.

The evidence shows that appellant took a taxicab to a spot near the victims' apartment on the night of the murders. In the apartment, Magee's blood was found in copious quantities along with a spent .38 caliber shell. Appellant's fingerprints were found in the apartment on a Budweiser beer can and on a telephone. Magee's hands and feet were bound with wire taken from the telephone.

Magee and Cadena were shot with .38 caliber handgun and Galvan was shot with a .25 caliber handgun. A .38 caliber Colt revolver was stolen from Jerry Ramsey and the holster for the weapon was found underneath the trailer next to appellant's trailer. Appellant purchased the .25 caliber Titan handgun used to murder Galvan. When arrested, appellant had a cut on his right that could have been caused by the slide recoil of a .25 caliber semi-automatic.

Cadena's blood soaked car was found near appellant's trailer with a trail of blood leading in the direction of the trailer. A Coke can with appellant's bloody palm print was found in the car.

Blood soaked jeans and underwear, of the same type and size as apparently worn by appellant, were found in a dumpster at appellant's trailer park. Body hairs of Cadena and hairs consistent with those of appellant were found on the jeans and underwear. Appellant's boots, seized from his trailer, were stained with blood consistent with that of Magee and in a pattern consistent with the splatter on the jeans.

Based on this evidence, we conclude that any rational trier of fact could find appellant guilty, beyond a reasonable doubt, of the murders of Cadena and Galvan. The evidence presented at trial does not support a reasonable inference other than appellant's guilt. Appellant's twelfth point of error is overruled.

In his first point of error, appellant asserts the trial court erred in allowing the State to call appellant's wife during its case in chief. In his second point of error, appellant asserts the trial court erred in allowing the State to introduce cross-examination testimony of appellant's wife which was taken during a pre-trial hearing. He argues that the prior testimony exceeded the scope of proper cross-examination and that he did not have a similar motive to develop his wife's testimony.

Elaine Johnson, appellant's wife, purportedly gave her written consent to a search of the trailer where she lived with appellant and her son. Appellant filed a motion to suppress evidence seized as a result of that search, claiming that the search of his trailer was made without the effective legal consent of anyone competent to give consent. At the pre-trial hearing held on the motion to suppress, appellant called his wife to testify only on the issue of her consent, namely whether it was given voluntarily or involuntarily. Ms. Johnson testified on direct examination, but reserved her privilege to not testify at trial. Ms. Johnson testified solely in regard to matters relating to the voluntary nature of her consent to search appellant's trailer. On cross-examination, the State, over objection, questioned Ms. Johnson regarding problems with her marriage and about the purchase, for appellant, of a pair of Wrangler blue jeans, size 38–34. Ms. Johnson

answered that she had in fact bought such a pair of jeans for appellant.

At trial, the State named Ms. Johnson as a possible witness and she was sworn in. Appellant then informed the trial court that Ms. Johnson wished to exercise her privilege to not testify, pursuant to Rule 504(2)(a) of the Texas Rules of Criminal Evidence[3]. During its case in chief, the State called Ms. Johnson as a witness. Over objection and in the presence of the jury, Ms. Johnson was forced to invoke her privilege to not testify against appellant. Immediately thereafter, the State introduced the portions of Ms. Johnson's pre-trial cross-examination testimony relating to her marital problems and the purchase of the jeans.

The general testimonial privilege of spouses is of medieval origin. Originally an absolute disqualification, the privilege survives today in a variety of more restricted evidentiary rules. For a brief history of the development of the spousal or husband-wife privilege, see *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).

In Texas, the testimonial privileges of spouses are embodied in Rule 504, TEX.R. CRIM.EVID. Rule 504(2)(a)[4] is a departure from the previous rule, article 38.11, TEX. CODE CRIM.PROC., which disqualified one spouse from testifying against another spouse, except where the spouse was accused of certain offenses against the family.[5] Under former article 38.11, it was reversible error for the State to call a defendant's spouse as a witness, if this was done in such a manner as to convey to the jury the impression that the spouse, if allowed to testify, would have rebutted defensive testimony previously given. *Stewart v. State*, 587 S.W.2d 148, 153 (Tex.Cr. App.1979); *Johnigan v. State*, 482 S.W.2d 209, 211 (Tex.Cr.App.1972). Also see, *Wall v. State*, 417 S.W.2d 59, 63 (Tex.Cr.App. 1967) (reversible error to compel spouse to take the witness stand and force her to claim privilege where the only purpose of calling the spouse was to have the jury use her refusal as a circumstance of guilt against accused spouse).

■ Rule 504(2)(a) provides the spouse with only a privilege to not be called as a witness for the State. The absolute disqualification of former article 38.11 has been removed, and replaced with a privilege to not be called as a witness for the State that may be asserted only by the defendant's spouse. The defendant has no power to prevent his or her spouse from testifying for the State. *Trammel v. United States*, supra, 445 U.S. at 53, 100 S.Ct. at 914.

As a general rule, claims of privilege should be made without the knowledge of the jury. Rule 513(b), TEX.R.CRIM. EVID., states: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the

---

3. Ms. Johnson was represented by appellant's attorney in regard to the invocation of her spousal privilege to not testify for the State. See note 4.

4. Rule 504(2)(a), TEX.R.CRIM.EVID., Privilege not to be called as a witness against spouse, states:

 *General rule of privilege.* The spouse of the accused has a privilege not to be called as a witness for the state. This rule does not prohibit the spouse from testifying for the state, even over objection by the accused. A spouse who testifies on behalf of an accused is subject to cross-examination as provided in Rule 610(b). Failure by an accused to call his spouse as a witness, where other evidence indicates that the spouse could testify to relevant matters, is a proper subject of comment by counsel.

5. TEX.CODE CRIM.PROC. art. 38.11 (repealed by Texas Rules of Criminal Evidence effective September 1, 1986) stated in pertinent part:

 Neither husband nor wife shall, in any case, testify as to communications made by one to the other while married. Neither husband nor wife shall, in any case, after the marriage relation ceases, be made witnesses as to any communication made while the marriage relation existed except in a case where one or the other is on trial for an offense and a declaration or communication made by the wife to the husband or by the husband to the wife goes to extenuate or justify the offense. The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution.

jury." Rule 513(a) forbids comment on the invocation of privilege, except as provided in 504(2)(a).

■ Rule 504(2)(a) allows the State to comment on the failure of the defendant to call his or her spouse, when "other evidence indicates that the spouse could testify on relevant matters." Such comment is allowed because the State is not permitted to call the defendant's spouse, and such inability to call the spouse might allow the jury to draw an inference adverse to the State's case.[6] However, if the State is always allowed to call the defendant's spouse and force the invocation of privilege in front of the jury, the rationale for allowing comment on the defendant's failure to call his or her spouse disappears. The spouse's invocation of privilege in front of the jury, without more, almost necessarily compels the jury to draw an inference adverse to the defendant[7].

Federal courts have held that it is error for the Government to call the defendant's spouse as a witness and force the invocation of privilege in the presence of the jury.

*San Fratello v. United States*, 343 F.2d 711 (5th Cir.1965) ("Courts have always frowned on the practice of compelling a spouse of an accused to claim testimonial privilege in the presence of the jury.... any genuine doubt about the availability of such testimony to the prosecution can always be settled by a preliminary interrogation of the witness [spouse] under oath in the absence of the jury."); *Melton v. United States*, 398 F.2d 321, 322 (10th Cir.1968) ("The prosecution should not call a witness in the presence of the jury when it knows and concedes that the witness will invoke a valid marital privilege."); *Labbe v. Berman*, 621 F.2d 26, 28 (1st Cir.1980) ("There are situations where a prosecution's questioning of a witness knowing the witness will decline to answer and will assert a privilege may be improper. This may be so when the prosecutor 'makes a conscious and flagrant attempt to build its case out of inferences arising from [the] use of the testimonial privilege' or where the 'inferences from a witness's refusal to answer [add] critical weight to the prosecution's case in a form not subject to cross-examina-

6. Apparently, such comment is permissible only when the witness spouse's testimony will be adverse to the accused spouse or will involve marital confidences. See Rule 504(1), TEX.R. CRIM.EVID., Confidential communication privilege. The privilege of 504(2)(a) is "not to be called as a witness for the state." The defendant's spouse does not have a right to refuse to give exculpatory testimony pursuant to the spousal privilege of Rule 504(2)(a). To allow the defendant's spouse to refuse to give exculpatory testimony when called by the defense would be inconsistent with the right of a criminal defendant to compulsory process for obtaining favorable witnesses. Amendments VI and XIV, United States Constitution. However, the accused spouse may properly assert the privilege for confidential marital communications. Thus, when the defendant's spouse's testimony will be adverse or will involve confidential marital communications, the failure to present such testimony "may be properly be viewed as the responsibility of the accused." 33 S. Goode, O. Wellborn & M. Sharlot, Guide to the Texas Rules of Evidence: Civil and Criminal § 504.7 (Texas Practice 1988).

7. The commentators are in agreement that the above analysis accurately states the general rule. "The structure of the two rules [504(2)(a) and 513] taken together suggests that only comment, and not compelled invocation before the

jury is permissible." 33 S. Goode, O. Wellborn & M. Sharlot, Guide to the Texas Rules of Evidence: Civil and Criminal § 513.1 at 357 (Texas Practice 1988).

> Rule 513 ... indicates that claims of privilege should be made, where practicable, outside the presence of the jury. Although Rule 504 indicates that the prosecution may comment on the failure of the accused to call the spouse to testify, it should not be able to accomplish the same result by calling the spouse and then let the jury hear the spouse's claim of privilege in the hope that the jury will draw inferences against the accused. The fact that the Rule expressly grants a privilege "not to be called as a witness" rather than a privilege not to testify surely has some significance here.

H. Wendorf & D. Schlueter, Texas Rules of Evidence Manual (2d Ed.) § 504(2)(a) (1988).

Indeed, in some circumstances it may be reversible error for counsel to call a witness for the purpose of demonstrating to the jury that a privilege is being claimed. *Id.* at § 513(b).

> [I]t is improper for the prosecutor to call an accused's spouse without first ascertaining outside the presence of the jury that the spouse will not object. If the spouse asserts the privilege, the government may not then call the spouse so as to force the privilege to be claimed in open court.

2 Weinstein's Evidence, ¶ 504–14 (commenting on Federal Standards 505 and 513(b)).

tion and thus unfairly [prejudices] the defendant.'" citing *Namet v. United States*, 373 U.S. 179, 186–87, 83 S.Ct. 1151, 1154–55, 10 L.Ed.2d 278 (1963)); *United States v. Chapman*, 866 F.2d 1326, 1333 (11th Cir.1989) ("[A]s a general matter it is improper to permit a witness [spouse] to claim a testimonial privilege in front of the jury where the witness's intention not to testify is known beforehand.").

■■■ The State under Rule 513(b), however, may still show that it is not practicable to allow the spouse to invoke the privilege outside the presence of the jury. In the instant case, the State claims a legitimate purpose in calling Ms. Johnson as a witness. The State argues that calling appellant's wife gave the jury the opportunity to understand why her testimony was being read rather than delivered live. We find this argument unpersuasive, and further find that the trial court erred in permitting the State to offer the witness in the presence of the jury over the claim of privilege. The State's mere assertion that calling Ms. Johnson as a witness would aid the jury's understanding of their trial tactics is not a sufficient rationale for undermining the efficacy of a spouse's privilege to not be called as a witness by the State.

Even though we find error by the trial court in allowing the State to call appellant's spouse as a witness and force the invocation of privilege in front of the jury, we will apply a harm analysis to this improper action [8]. TEX.R.APP.P. 81(b)(2).

■■■ In the instant case, Ms. Johnson was called as a witness by the State and invoked her privilege in front of the jury; but the State then immediately introduced the portions of her testimony from the pre-trial hearing relating to her marital problems with appellant, and her purchase of a pair of blue jeans for appellant. Consequently, if the jury had been inclined to speculate about what Ms. Johnson could offer in testimony against appellant, the State's introduction of her prior testimony

cut short any inferences the jury might have drawn from Ms. Johnson's invocation of her privilege and her subsequent silence. Thus, the State's actions did not implicate the concerns identified in *Labbe*, supra and *Namet*, supra. The State did not flagrantly and consciously attempt to build its case on inferences drawn from Ms. Johnson's invocation of her privilege, nor did inferences drawn from her invocation add critical weight to the State's case. Whatever error may have occurred when the State called appellant's wife as a witness, was rendered harmless by the introduction of her previous testimony, which then terminated the possibility that the jury would draw additional inferences adverse to appellant. Appellant's first point of error is overruled.

Having determined that the violation of the spousal privilege was rendered harmless, we must now determine whether it was reversible error for the trial court to allow the State to cross-examine appellant's wife on matters irrelevant to the issue before the court at the pre-trial hearing, and to then introduce portions of that testimony at appellant's trial.

■■■ The trial court has discretion to "set any criminal case for a pre-trial hearing before it is set for trial upon its merits." TEX.CODE CRIM.PROC. art. 28.01. The purpose of the pre-trial hearing is to enable the judge to dispose of certain matters prior to trial and thus avoid delays during the trial. *Bosley v. State*, 414 S.W.2d 468, 470 (Tex.Cr.App.), *cert. denied*, 389 U.S. 876, 88 S.Ct. 172, 19 L.Ed.2d 162 (1967). At appellant's pre-trial suppression hearing the sole issue was whether appellant's wife had voluntarily consented to a search of her and appellant's trailer home. To establish that his wife's consent was not voluntarily given, appellant called her to testify at his pre-trial hearing. Appellant's wife was then cross-examined by the State about matters which were largely irrele-

---

**8.** We note that even under former article 38.11, where the defendant's spouse was disqualified from testifying, the State's calling of the witness spouse in the jury's presence did not automatically constitute reversible error. Instead, a harm analysis was applied when appropriate. *Aguilar v. State*, 715 S.W.2d 645, 649 (Tex.Cr. App.1986).

vant to the issue of whether her consent to search was voluntarily given.

Rule 104(a), TEX.R.CRIM.EVID., applies to preliminary questions, including the admissibility of evidence. The second sentence of Rule 104(a), with respect to determining preliminary questions relating to admissibility, frees the trial court from the rules of evidence, except those relating to privileges [9].

Rule 504(2)(a), which is a privilege rule, provides that "a spouse who testifies on behalf of an accused is subject to cross-examination as provided by Rule 610(b)", TEX.R.CRIM.EVID. Rule 610(b) states that "a witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Relevant evidence is defined in Rule 401, TEX.R.CRIM. EVID., as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This sequence demonstrates that the provision of Rule 504(2)(a) allowing cross-examination of a witness spouse must necessarily be interpreted within the bounds of Rules 610(b) and 401.

▮ Thus, the question before us now is whether the evidence adduced through the State's cross-examination of appellant's wife was of consequence to the determination of the action before the trial court at the pre-trial hearing. In the instant case, appellant's wife was cross-examined by the State in regard to her marital relations with the appellant and the purchase of a pair of Wrangler blue jeans for her husband. Her testimony concerning the purchase of the blue jeans was not of any conceivable consequence to the determination of whether her consent to search was given voluntarily. The cross-examination, at a pre-trial hearing on a motion to suppress evidence, of a witness spouse who retains her privilege to not testify at trial, must be limited to those questions that are of direct consequence to the matter to be determined at that hearing [10]. Testimony which does not tend to make more or less probable any fact of consequence to the action, in this case—the determination of the motion to suppress evidence seized during the consent search of appellant's trailer, is irrelevant. Thus, it was error for the trial court to allow the State to cross-examine appellant's wife as to matters irrelevant to the suppression hearing.

**9.** There are apparently no pre–Rules Texas cases on this matter. See Wellborn, Article I of the Texas Rules of Evidence and Articles I and XI of the Texas Rules of Criminal Evidence: Applicability of the Rules, Procedural Matters, and Preserving Error, 18 St.Mary's L.J. 1165, 1187 (1987).

**10.** Furthermore, Rule 104(a) if read literally, would do away with the need for pre-trial hearings on preliminary facts, such as those facts relevant to motions to suppress. We note that Texas Rule 104(a) is identical to Rule 104(a) of the Federal Rules of Evidence. Professors Wright and Graham have concluded that relevance must be taken into consideration, if we are to make logical sense of Rule 104(a).

> [T]he Rule [104(a) ] would permit the judge to make his determination on the basis of irrelevant evidence, though such a determination might be overturned by an appellate court on the basis of the sufficiency of the evidence to support the finding. Obviously the drafters did not intend the Rule to be read literally. While the judge is not "bound" by the Rules of Evidence, it was probably expected that judges would apply them in most cases. The

> question then is not the existence of the power to disregard the Rules, but rather when that power should be exercised.
>
> \* \* \* \* \* \*
>
> While Rule 104(a) might in theory permit the judge to dispense with the requirement that evidence be relevant, there would be little point in this, ... since irrelevant evidence would not support a preliminary finding.

C. Wright & K. Graham, 21 Federal Practice and Procedure § 5055. Thus, evidence and testimony presented at a pre-trial hearing should be relevant to the preliminary fact questions necessary to determine the matters at issue at the hearing.

Article 28.01 does impose limits on the purpose and conduct of pre-trial hearings. Although "discovery" is included in a list of matters to be determined by the court at a pre-trial hearing, article 28.01 was not intended to broaden the scope of such hearings so as to turn them into a proceeding allowing full blown discovery. If such were the case, every witness at a pre-trial hearing would be subject to cross-examination on any matter of consequence to the determination of any phase of the trial.

Although, we conclude that the trial court erred in permitting irrelevant cross-examination at the pre-trial hearing, we must now determine whether it was reversible error to allow the State to introduce at trial portions of the pre-trial cross-examination testimony of appellant's wife. See TEX.R.APP.P. 81(b)(2); see also *Harris v. State*, 790 S.W.2d 568 (Tex.Cr.App. 1989).

The only conceivably harmful aspect of appellant's wife's testimony was her statement that she had purchased a pair of Wrangler blue jeans, size 38–34, for her husband approximately three weeks before the date of the murders of Magee, Cadena and Galvan. This testimony made it slightly more probable that the relatively new blood splattered jeans found in the dumpster at appellant's trailer park were in fact those of the appellant. We note, however, that this testimony was in no way the only evidence that linked appellant to the jeans found in the dumpster. Appellant had been seen throwing something into the dumpster, which was apparently not his usual practice. Appellant had been seen wearing a relatively new pair of jeans on the night of the murders. Hairs consistent with those of appellant were found on the blood stained underwear that was found in the same dumpster. The blood splatter pattern on the jeans was consistent with the pattern found on appellant's work boots, and indicated that the boots and the jeans had been worn together at the time that they were stained. Blood consistent with that of Magee was found on the jeans and the boots.

Even if the spouse's testimony concerning the purchase of the blue jeans were excluded from our consideration, the remaining evidence is both cumulative and overwhelming of appellant's guilt. See generally *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). We note that the State presented incriminating evidence concerning: ballistics and the causes of death; appellant's possession of one of the murder weapons; appellant's fingerprints and palmprints on objects in the victims' apartment and Cadena's car; blood stains leading from Cadena's car in the direction of appellant's trailer; appellant's proximity to the victims' apartment on the night of the murders; appellant's motive; threats made to two of the victims by appellant; analysis of blood found on appellant's boots and analysis of blood and hair found on underwear discovered in the dumpster near his trailer; matching analysis of the victims' blood and hair; and an injury on appellant's hand at time of his arrest, consistent with that caused by the slide recoil of one of the murder weapons. Thus, in evaluating "the probable impact of the error in light of the existence of the other evidence," *Harris*, supra at 587, we find beyond a reasonable doubt that the error made no contribution to appellant's conviction or to his punishment. TEX.R.APP.P. 81(b)(2). Appellant's second point of error is overruled.

In his third point of error, appellant asserts the trial court erred in denying his motion to suppress evidence, arguing that the state showed neither voluntary consent nor a valid search warrant. Appellant argues that the facts as developed at his pre-trial hearing show that appellant's wife did not voluntarily consent to the search of her and appellant's trailer and that her consent was a mere submission to a claim of lawful authority.

At the pre-trial suppression hearing the following facts were elicited. Appellant lived in his trailer at the Portobello Village trailer park with Elaine Johnson, his wife, and Michael Johnson, his stepson. At the time of the search, however, Ms. Johnson had been staying with a friend for about a week. The title to the trailer was jointly held by appellant and his wife.

Officer Linda Thompson of the Aransas Pass Police Department was the primary police contact with Ms. Johnson. According to Thompson's testimony she conducted three "conversations" with Ms. Johnson. The first conversation was held on September 30, the day appellant was arrested. Ms. Johnson went to the police station

around 4 a.m. to pick up her son, Michael, who had been taken to the station when appellant was arrested. At that time, Thompson advised Ms. Johnson of the charges against her husband and that she was not under investigation and had not done anything wrong. Later that day, Thompson called Ms. Johnson at work, but stopped when she learned this was causing problems. The next day, Thompson went to the store where Ms. Johnson worked and asked her to come to the police station after she got off work. Ms. Johnson went to the police station after work, was presented with a consent to search form and eventually signed it. Thompson testified that she told Ms. Johnson that the police wanted to search the trailer and that they would need her to sign a consent to search. According to Thompson, she did not tell Ms. Johnson that she would get a search warrant if Ms. Johnson did not give her consent. Thompson further testified that on October 1, Ms. Johnson was "much more calm" and had "much more understanding of what was going on" than on the day of appellant's arrest. Thompson did not know if other officers had approached Ms. Johnson in connection with the consent to search.

Ms. Johnson testified at the pre-trial that she had not been living at her and appellant's trailer for about a week prior to the murders. She had first gone to the police station on September 29, after receiving a call from Thompson. Thompson and her husband, also a police officer, questioned her for two or three hours. She was told not to go back to the trailer or call appellant. Ms. Johnson went to the convenience store where she worked. She returned to the police station early the next morning to pick up her son who had been taken to the station with appellant. According to Ms. Johnson, police made her wait for approximately one-half hour before they released her son.

Ms. Johnson was not contacted again until October 1, when she began receiving telephone calls from Thompson at work. After she told Thompson not to call her at work, Thompson came into the store and asked her to come to the police station

after work. When she arrived at the police station, she was presented with a consent to search form and told that if she did not sign it the police would get a search warrant. According to Ms. Johnson, officers had again questioned her son before she arrived at the station. She also tried to contact appellant three or four times prior to signing the consent to search but was unable to reach him. She then signed the consent to search with the proviso that she be at the trailer when it was searched. Ms. Johnson testified that at the time she signed the consent to search, she was on medication (tranquilizers) and under the care of a doctor. Ms. Johnson testified that she had since reconciled her differences with appellant that had caused her to move out of their trailer.

Texas Ranger Charles Brune, who assisted in the investigation, testified that prior to the search Ms. Johnson was "very cooperative" and that her attitude had changed since then and that she was now uncooperative.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973); *Juarez v. State,* 758 S.W.2d 772, 775 (Tex.Cr.App.1988). "It is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Schneckloth,* supra 412 U.S. at 233, 93 S.Ct. at 2050. The Supreme court emphasized that "[i]n examining all the surrounding circumstances to determine if in fact the consent was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 229, 93 S.Ct. at 2049.

■■■■ This Court has held that consent must be freely and voluntarily given to be considered effective. Furthermore, the burden of proof is upon the State to show by clear and convincing evidence that

the consent was freely and voluntarily given. *Paprskar v. State*, 484 S.W.2d 731, 737 (Tex.Cr.App.1972); see *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Consent must not be physically or psychologically coerced. *Paprskar*, supra. Consent cannot be established by "showing no more than acquiescence to a claim of lawful authority." *Bumper*, supra at 548, 88 S.Ct. at 1792.

■■■■ Consent may be ineffective if induced by a show of force or other coercive surroundings. See W. Lafave, 3 Search and Seizure § 8.2(b). In evaluating the validity of consent, a court may stress that the consent was obtained in an environment with few police officers and without the use of weapons, *United States v. Williams*, 754 F.2d 672 (6th Cir.1985) (consent given in the presence of one officer and no weapons in view); *Lowery v. State*, 499 S.W.2d 160 (Tex.Cr.App.1973) (validity of consent to search residence not supported by evidence where consent was obtained in the presence of five officers with pistols and shotguns in their hands). However, a consent to search given in response to a threat to seek or obtain a search warrant has been upheld as voluntary. *United States v. Raines*, 536 F.2d 796 (8th Cir.1976); *United States v. Boukater*, 409 F.2d 537 (5th Cir.1969); *United States v. Castillo*, 866 F.2d 1071 (9th Cir.1988); *United States v. Stallings*, 810 F.2d 973 (10th Cir.1987; but see *United States v. Faruolo*, 506 F.2d 490 (2d Cir.1974) (concurring opinion) ("Any intimation that the warrant will automatically be issued should be considered as coercive as the announcement of an invalid warrant.")

■■■■ The trial court is the sole fact finder at a hearing on a motion to suppress evidence and may choose to believe or disbelieve any or all of the witnesses' testimony. *Taylor v. State*, 604 S.W.2d 175, 177 (Tex.Cr.App.1980); *Clark v. State*, 548 S.W.2d 888 (Tex.Cr.App.1977). Since the trial court is the sole fact finder at a suppression hearing, this Court is not at liberty to disturb any finding which is supported by the record. *Green v. State*, 615 S.W.2d 700, 707 (Tex.Cr.App.1980), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981); *McKittrick v. State*, 541 S.W.2d 177 (Tex.Cr.App.1976). Thus, where the record supports a finding that consent to search was freely and voluntarily given, this Court will not disturb that finding.

■■■■ In the instant case, the testimony of Thompson and Ms. Johnson conflict on several points, including the number and time of the conversations held between them. The trial court, however, could choose to believe or disbelieve any of either's testimony. Since the testimony of Thompson would clearly establish that Ms. Johnson's consent to search was freely and voluntarily given, and because the trial court could choose to disbelieve any part or all of Ms. Johnson's testimony, the record is sufficient to support the trial court's finding that consent was freely and voluntarily given.[11] Appellant's third point of error is overruled.

In his fourth point of error, appellant asserts the trial court erred in admitting evidence of analysis of his blood, which was seized from him pursuant to a search warrant. He argues that the affidavit in the warrant contained no probable cause to support the issuance of the warrant. In his fifth point of error, appellant asserts that the same search warrant was overbroad in authorizing seizure of his blood. He argues that the affidavit provided no probable cause for seizure of blood. Appellant contends that: the search warrant did not comply with the requisites of article

---

11. Even if all of Ms. Johnson's pre-trial testimony were believed by the trial court, the totality of the circumstances surrounding her consent to search do not indicate that her consent was coerced by the police. Her consent was given in the presence of only one or two officers who made no apparent show of force. In addition, her husband had already been arrested and no threats were made to arrest her son. Although justifiably upset by the unfolding events, Ms. Johnson did not testify that she was unable to understand what was happening and what was at stake. Her insistence that she be present when the warrant was executed indicates that she understood the situation.

288

18.01, TEX.CODE.CRIM.PROC.; the affiant had no contact with appellant; the affiant did not demonstrate the basis of his knowledge as to the information in the affidavit; and the affiant did not vouch for the credibility of his sources of information, all in violation of the Fourth Amendment, United States Constitution and Article I § 9, Texas Constitution.

The affidavit in support of the search warrant authorizing seizure of appellant's blood, saliva, and head and pubic hair, contained the following statements and accusations:

1. On September 29, 1987, the bodies of Magee, Cadena and Galvan were discovered and it was determined that they all died as a result of gunshot wounds. Hairs were discovered in the hands of all of the victims.

2. Investigation revealed that appellant had previously had verbal and physical confrontations with Magee.

3. On the evening of September 28, a taxicab driver picked up appellant at his residence and took him to the Jackson Square Apartments where the victims lived in apartment number 118.

4. Human blood was found in the victims apartment.

5. Fingerprints lifted from the telephone in the victim's apartment matched those of appellant.

6. Cadena's car was found at the Aransas Pass Nursing Home, two block's from appellant's residence. Human blood was found in the car.

7. A blood soaked towel and blue jacket were found on the roof of the nursing home. The jacket matched the pants Cadena was wearing.

8. A witness observed appellant throwing something into the dumpster near his residence.

9. A search of the dumpster revealed a blood soaked pair of pants and men's underwear. Negroid hairs were imbedded in the underwear.

10. Appellant is a "negro" male.

The task of the issuing magistrate is to make a practical common sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The affidavit must be more than a "mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause." The magistrate must be presented with "sufficient information" to allow that individual to determine probable cause; "his action cannot be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983). The magistrate should not be bound by standards such as proof beyond a reasonable doubt or by a preponderance of the evidence. The magistrate's sole concern should be probability. *Gates*, supra; *Bower v. State*, 769 S.W.2d 887 (Tex.Cr.App.1989), *cert. denied*, — U.S. —, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989).

In *Eisenhauer v. State*, 754 S.W.2d 159 (Tex.Cr.App.1989), *cert. denied*, 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988), this Court held that Article I § 9 of the Texas Constitution and the Fourth Amendment of the Federal Constitution are "in all material aspects the same." In addition, this Court found that the Supreme Court's decision in *Gates* was "in no way repugnant to Article 18.01," TEX.CODE CRIM. PROC.

The ultimate inquiry of Article 18.01 concerns the existence of probable cause, which must be established by 'sufficient' and 'substantial' facts. *Aguilar v. Texas; Spinelli v. United States*, and *Illinois v. Gates* do not change the basic underlying rule. The only things that have changed are the measures which the Supreme Court created to aid in arriving at a determination of the existence of sufficient facts to show probable cause.... In *Gates*, the measure is the totality of the circumstances. Only the methodology of determining if the basic rule has been satisfied has changed, not the basic rule itself. *Gates*, like Article

18.01, continues the demand for 'sufficient and substantial facts.'

*Id.* at 164 (citations omitted).

■■■■ The reliability of the affiant and his sources of information are part of the "totality of the circumstances" that the magistrate should evaluate in making his probable cause determination. A magistrate, however, is entitled to rely on source information supplied by an average citizen, since, unlike many police informants, they are "much less likely to produce false or untrustworthy information." *Jaben v. United States,* 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965); see *Esco v. State,* 668 S.W.2d 358 (Tex.Cr.App.1982). The same rule applies to law enforcement officers. The magistrate may rely on the affidavit of a police officer based on his knowledge or the knowledge of other officers. "Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

■■■ Appellate court review of the sufficiency of an affidavit is not a *de novo* review. The magistrate's determination of probable cause should be given great deference by the reviewing court. *Gates,* supra 462 U.S. at 236, 103 S.Ct. at 2331. "[T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* at 236, 103 S.Ct. at 2331, citing *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960), *overruled on other grounds,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Nonetheless, "courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." *Id.* 462 U.S. at 239, 103 S.Ct. at 2333.

■■■ In the instant case, the affidavit in support of the search warrant was based on information supplied by police officers and citizens. None of the information was obtained from confidential informants. Thus, the magistrate was entitled to rely on the credibility of the affiant and his sources and the reliability of the information supplied in the affidavit. Appellant's fourth and fifth points of error are overruled.

In his sixth point of error, appellant reasserts that there was no probable cause to support issuance of the search warrant authorizing seizure of his blood, hair and saliva, and that there was no showing of a good faith exception to proceed with the seizure of blood, hair or saliva. Appellant asserts that the magistrate wholly abandoned his judicial role in making his probable cause determination. However, as we have already determined that the search warrant was validly issued based on probable cause, we find that the magistrate did not abandon his judicial role and no showing of a good faith exception was required. Appellant's sixth point of error is overruled.

In his seventh point of error, appellant asserts the trial court erred in admitting evidence of chemical analysis of appellant's blood, arguing that there was no showing that his blood was seized as a result of a facially valid search warrant. Appellant complains that there was no showing that the warrant was validly issued by any magistrate. In his brief, appellant asserts that there was no evidence presented at trial, and the trial court made no findings, that the signatures on the affidavit or on the warrant were authentic.

At trial, the State called Dr. Wendell Roberts to testify in connection with blood, saliva and hair samples seized from appellant. Over appellant's objection, Roberts testified that he took samples of appellant's blood, saliva and hair pursuant to a court order (search warrant). Roberts then produced the search warrant and the State offered it in evidence. Appellant objected to admission of the search warrant on the basis that the requisites of article 18.01 and 18.02 had not been met.

 When a defendant challenges the validity of a search, and the State introduces a facially valid search warrant, the burden of proof is on the defendant to go forward with evidence to show the invalidity of the warrant. *Rumsey v. State*, 675 S.W.2d 517 (Tex.Cr.App.1984). The search warrant was valid on its face. The warrant contained the following: the sworn affidavit of Officer Dean Smith detailing the facts constituting probable cause; a statement that an offense had been committed; a description of the items to seized; and a description of the location where the items could be found. Thus after his challenge, the burden was on appellant to show that the warrant was invalid. Appellant argues that no evidence was presented to show that the signatures on the affidavit and warrant were valid. Appellant, however, does not point to any evidence in the record to contradict the validity of the warrant. Therefore, appellant has failed to meet his burden to show the invalidity of the warrant. Appellant's seventh point of error is overruled.

In his eighth point of error, appellant asserts the trial court erred in admitting hearsay testimony regarding statements made by the deceased Magee.

At trial the State called Diane Leucht, a former co-worker of appellant and Magee at Grasso Oilfield Services. Leucht testified generally about the work relationship between appellant and Magee. Appellant complains, however, that Leucht was erroneously allowed to testify as to statements she heard Magee make with respect to his relationship with appellant. Over objection, Leucht testified as follows:

Q. [By Mr. Gilmore, prosecutor] What did Mr. Magee tell you?

A. Mr. Magee told me that Mr. Johnson said he was on our side, and that he was going to get even with him, and that he was going to get him.

We note, however, that on redirect examination, Leucht testified without objection as follows:

Q. [By Mr. Gilmore] But I'm talking about after Mr. Johnson was fired, and you said—was David Magee helping Eddie Johnson in his discrimination suit after he was fired?

A. I don't know. The phone conversations that—I can only tell you that he would hang up the phone and what he would say after that.

Q. Okay. And maybe I'm misunderstanding something. Was there a discrimination suit filed by Mr. Johnson before he was fired?

A. Not that I know of. The conversations—the telephone conversations were after Mr. Johnson was terminated. Mr. Johnson called frequently to Mr. Magee, and he would say "I can't talk to you about that right now," or he would hang up the phone and he would say, "Oh, he's mad, he's gonna get even," or—

We are presented with two similar hearsay statements made by Magee. Appellant timely objected to the first statement, but failed to object to the second statement. Although the two statements may be distinguished, the effect of both statements is the same. Both statements convey the impression that appellant threatened to get even with Magee. "[I]t is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered." *Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Cr.App.1984); *Brasfield v. State*, 600 S.W.2d 288, 296 (Tex.Cr.App.1980), *overruled on other grounds*, 739 S.W.2d 813 (1987); see also *Willis v. State*, 785 S.W.2d 378 (Tex.Cr. App.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 279, 112 L.Ed.2d 234 (1990). Therefore, appellant has failed to preserve this point of error for review. Appellant's eighth point of error is overruled.

In his ninth point of error, appellant asserts that the trial court erred in admitting the grand jury testimony of witness Theresa Holmes, arguing that he was denied due process and deprived of the right to confront and cross-examine the witness.

The State called Theresa Holmes. Holmes testified that she knew appellant and that she had asked appellant about purchasing a gun. According to Holmes,

appellant had a gun he was willing to sell her, but she could not remember if it was a .22 or .25 caliber weapon. The State then asked Holmes whether she recalled her grand jury testimony where she stated that appellant had a .25 caliber gun and another gun. Holmes testified that she could not now remember if it was a .22 or .25 caliber gun, and that she had not previously testified that appellant had told her that he had another gun. The State then attempted to impeach Holmes with her prior inconsistent statements made before the grand jury. The State had Holmes read, without objection, the pertinent portions of her grand jury testimony, which indicated; she had discussed the purchase of a .25 caliber automatic with appellant; appellant had shown her a .25 caliber automatic; and appellant had told her that he also had a .38 caliber gun. After further testimony from Holmes, the State then offered into evidence a transcript of Ms. Holmes grand jury testimony. Appellant objected to the admission of the copy of Holmes' grand jury testimony, on the basis that he was denied the right to confront Holmes at the grand jury hearing. Appellant's objection was overruled.

Appellant failed to object when Holmes read from a copy of her grand jury testimony [12], but then objected when the State introduced a transcript of that same testimony. The record reveals that the grand jury testimony that Holmes read was essentially the same as the transcript of the testimony offered by the State. The only additional possibly inculpatory testimony in the transcript was a statement by Holmes that her talk with appellant about the guns had occurred about a week before the date of the murders.

To be timely an objection must be raised "at the earliest opportunity," or "as soon as the ground of objection becomes apparent." *Polk v. State*, 729 S.W.2d 749, 753 (Tex.Cr.App.1987), *reversed in part on other grounds*, 749 S.W.2d 813 (1988), citing *Cooper v. State*, 500 S.W.2d 837, 841 (Tex.Cr.App.1973) and *Sierra v. State*, 482 S.W.2d 259, 263 (Tex. Cr.App.1972). Furthermore, as previously noted, an objection is required every time inadmissible evidence is presented. Error in allowing inadmissible evidence is cured when the same evidence comes in without objection elsewhere at trial. *Hudson*, supra.

In the instant case, appellant objected only when a transcript of testimony, which had already been read to the jury, was offered by the State. The record clearly reveals that appellant was informed that Holmes was reading from her grand jury testimony. Thus, we find that appellant failed to object as soon as the ground of objection became apparent and his later objection was ineffective as the objectionable material was already in front of the jury in the form of Holmes' direct testimony. Appellant's ninth point of error is overruled.

---

12. Grand jury testimony is clearly inadmissible at trial, when a proper objection is raised by opposing counsel. Rule 801(e)(1)(A), TEX.R. CRIM.EVID. states in pertinent part:
 (e) **Statements Which are Not Hearsay.** A statement is not hearsay if—
 (1) **Prior Statement by Witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial hearing or other proceeding, except a grand jury proceeding ...
Rule 804(b)(1), TEX.R.CRIM.EVID., states in pertinent part:
 (b) **Hearsay Exceptions.** The following are not excluded if the declarant is unavailable as a witness.
 (1) **Former Testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
Rule 801(e)(1)(A) specifically excludes grand jury testimony from the category of statements as non-hearsay. Thus, grand jury testimony is classified as hearsay and subject to the rules as such. Rule 804(b)(1) is the former testimony exception to hearsay. The Rule, however, does not encompass grand jury testimony offered against defendants, since a defendant does not have an opportunity to develop the testimony of grand jury witnesses.

In his tenth point of error, appellant asserts the trial court erred in admitting into evidence a plastic bag containing cocaine, seized during the search of appellant's trailer. Appellant contends that the State did not show that he exercised custody or control over the cocaine, and that the cocaine constituted evidence of an extraneous offense not within the exceptions of Rule 404(b), TEX.R.CRIM.EVID., all in violation of his right to due process.

During the search of appellant's trailer and its curtilage, officers discovered a plastic "Baggie", containing cocaine, taped to appellant's trailer.

When the State introduced the plastic bag containing cocaine, appellant objected as follows:

> MR. LEWIS: Your honor, we object that these things have not been identified as cocaine, are prejudicial, and have not been linked to Mr. Johnson either by his possession, custody, or control, or any affirmative act, and we object to their admission in this case.
>
> THE COURT: Overrule the objection on that ground.

■■■ The cocaine admitted at trial was evidence of an extraneous offense. Thus, appellant's legal basis for trial objection should have been that the evidence was offered to prove an extraneous uncharged offense not within the permissible scope of Rule 404(b) and was offered to show that appellant was a criminal generally. Appellant failed to make this proper objection at trial. Even assuming arguendo that the State failed to adequately prove an affirmative link between the cocaine and appellant, see *Pollan v. State*, 612 S.W.2d 594 (Tex.Cr.App.1981), the appellant's objection did not address the evidentiary basis for exclusion of this evidence. Thus, the point now raised on appeal does not comport with the objection made at trial. Since the trial judge did not have an opportunity to rule on an extraneous uncharged offense objection, nothing is presented for appellate review. An objection stating one legal theory may not be used to support a different legal theory on appeal. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Cr.App.1990); *Zil-*

*lender v. State*, 557 S.W.2d 515, 517 (Tex. Cr.App.1977). Appellant's tenth point of error is overruled.

In his eleventh point of error, appellant asserts the trial court erred in admitting, during the punishment phase, a series of photographs depicting the corpse of appellant's murdered brother. Appellant argues that the State made no showing that he was substantially linked with or guilty of the offense depicted in the photographs.

During the punishment phase of the trial, the State called Lieutenant Raymond Hartman of the Chicago Heights Police Department. Hartman testified that on January 26, 1974 he had been called to investigate the homicide of Andrew Johnson, appellant's brother. Hartman identified a series of photographs as accurately depicting the homicide scene in the kitchen at the home of J.D. Johnson, where Andrew Johnson was murdered, and also identified a photograph depicting the victim in a hospital emergency room. The State then called Linda Martinez, who testified that she knew appellant and had been his girlfriend. Martinez testified that she was living with appellant in January of 1974, when appellant told her that he had killed his brother Andrew. Appellant admitted that he laid in wait in the pantry for his brother and shot him. After Martinez's testimony the State offered the photographs into evidence.

Appellant's objection to the admission of the photographs was as follows:

> MR. LEWIS: Your honor, as to all these offered exhibits, Your Honor, we object on the legal grounds that if these pictures are being offered to show Mr. Johnson's connection with some act of misconduct or other wrong or crime, that they are inadmissible because the fact of the crime, itself, is all that is admissible. Otherwise, these pictures in their depiction are gross and obscene and entirely prejudicial and no probative purpose [sic] in this case.

Appellant's ground of objection at trial was that the photographs themselves were inadmissible as evidence of the prior crime and that only the fact of the crime was

admissible. On appeal, appellant asserts that the State did not substantially link appellant with the crime depicted in the photographs. Thus, the point now raised on appeal does not comport with the objection made at trial. *Rezac*, supra; *Zillender*, supra. Appellant's eleventh point of error is overruled.

The judgment of the trial court is affirmed.

BERCHELMANN and STURNS, JJ., not participating.

CLINTON, Judge, dissenting.

A recognized privilege is highly valued and scrupulously protected in our own rules of criminal evidence and elsewhere in the Rule of Law. In my judgment testimony erroneously obtained by breach of the spousal privilege may not then be used to render the error harmless. Beyond that the majority falls back on a harm analysis it disapproved in *Harris v. State*, 790 S.W.2d 568, at 587 (Tex.Cr.App.1989): "[A]n appellate court should not determine the harmfulness of an error simply by examining whether there was overwhelming evidence to support the defendant's guilt." Certainly, the majority fails to direct its focus on the factors emphasized in the methodology outlined in *Harris*, at 587–588.

To diminishing the guarantee of our spousal privilege by overruling the second point of error, I respectfully dissent.

TEAGUE, Judge, dissenting.

Eddie James Johnson, henceforth appellant, was charged by indictment and convicted by the jury of committing the murders of Virginia Cadena and Elizabeth Galvan, who were mother and daughter. Another individual, David Magee, who lived with Cadena and Galvan, was also murdered on the night in question. Because the murders of Cadena and Galvan were alleged to have been committed during the same criminal transaction on the same day in question, this caused the two murders to become the offense of capital murder. See V.T.C.A., Penal Code § 19.03(a)(6). After the jury answered the submitted special issues in the affirmative, the trial judge assessed appellant's punishment at death by lethal injection. See Art. 37.071, V.A.C.C.P. Appeal to this Court is automatic. See Art. 37.071(h), supra, and Rule 40(b)(1), Tex.R.App.Proc.

Testimony was adduced that a pair of Wrangler blue jeans and Fruit of the Loom underwear, both of which were of the same type and size as apparently worn by appellant, and both of which were found to have been soaked in blood, but which had also apparently been recently washed, were found at the bottom of a dumpster located near appellant's trailer home.

At trial, during the State's case in chief, the State called appellant's wife to testify, and she was required to refuse to testify in the presence of the jury. Also over objection, the State had admitted into evidence a portion of the transcription of appellant's wife's testimony that she gave on cross-examination at the pretrial hearing that was conducted on appellant's motion to suppress evidence that had been seized by the police from his residence, pursuant to his wife's consent to search. This testimony reflected that appellant and his wife had separated approximately one week before the murders were committed because "all he [appellant] was doing was laying around the house, watching television and not working ... and getting fat ..."; and that she had purchased appellant a new pair of Wrangler blue jeans [approximately three weeks before the murders were committed] "because he had gained weight."

The majority opinion agrees with appellant that his first two points of error should be sustained. (See page 14 of slip opinion.) I agree. Appellant's points of error are as follows: (1) "[T]he trial judge erred [at trial] in permitting the prosecutor to call Appellant's wife to the stand as a witness for the State, and in the presence of the jury forced Appellant to object to her testimony and forced her to claim her privilege," and (2), "[I]t was harmful error for the Court to allow the State cross-examination testimony of Appellant's wife [sic], taken during a pre-trial hearing, to be

introduced at trial against him in that said prior testimony exceeded the scope of proper cross-examination by the State and Appellant did not have the similar motive to develop his spouse's testimony." The majority opinion, however, erroneously concludes that the error was harmless under Rule 81(b)(2), Tex.R.App.Pro. I disagree with this determination.

The record reflects that the trial judge declined to instruct the jury that no inference could be drawn from the fact that appellant's wife had invoked her spousal privilege not to testify against appellant in the jury's presence.

The record reflects that after appellant was arrested pursuant to an arrest warrant, the validity of which is not challenged in this cause, the police attempted to obtain his consent to search his and his wife's residence, a trailer home, but he refused to give his consent. However, the day after he was arrested by the police, his wife gave her written consent to Linda Thompson, a member of the Aransas Pass Police Department, to search her and appellant's residence.

I pause to point out that the record is clear that by the time the trial judge conducted the pretrial hearing on appellant's motion to suppress, appellant's wife never indicated before that time, or thereafter, that she wanted to testify for the State and against appellant.

It is axiomatic that the spousal privilege is one of the oldest legal privileges still recognized by our courts. The privilege was applied by the Supreme Court of the United States as early as 1839 in *Stein v. Bowman*, 38 U.S. (13 Pet.) 209, 10 L.Ed. 129 (1839), and Texas recognized the privilege even before it became a member of the Union. See *Republic of Texas v. Mumford*, Dallam 374 (1840).

For a brief history of what has been characterized as the "husband-wife" privilege, or the "spousal" privilege, see *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). See also *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

The spousal privilege is based on the Common Law, *In re Grand Jury Investigation of Hugle*, 754 F.2d 863 (9th Cir. 1985), and not on constitutional grounds. See *United States v. Lefkowitz*, 618 F.2d 1313 (9th Cir.) cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980). See also Meeker and Kirk, "Evidentiary Privileges Under Federal and State Law" (Paper delivered at the Advanced Criminal Law Course, July, 1990).

Rule 504(2)(a), Texas Rules of Criminal Evidence, which is the present day version of Texas' "husband-wife" privilege, and which was in effect when this cause was tried, expressly provides: "The spouse of the accused *has a privilege not to be called as a witness for the state....*" (My emphasis.) Rule 513(b) also expressly provides: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege *without the knowledge of the jury.*" (My emphasis.) Rule 513(c) expressly provides: "Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom." I find that none of the above rules were honored or adhered to by either the prosecution or the trial judge in this cause.

The record reflects that prior to trial the trial judge conducted a hearing on appellant's motion to suppress the evidence that the police had seized from his residence pursuant to his wife's consent to search. Besides Officer Thompson, the other witnesses who testified at the pretrial hearing were appellant's wife and a Texas Ranger, whose testimony I find is not important to our discussion. Almost virtually all of the State's cross-examination of appellant's wife, which occurred over objection, was irrelevant to the issue that was then before the trial judge to resolve, that is, whether appellant's wife's consent to search her and appellant's residence was voluntarily given to Thompson.

At trial, notwithstanding that the prosecution obviously knew or should have known that appellant's wife was going to invoke her spousal privilege, the State, in the presence of the jury, called appellant's wife to be a witness for the State. Over objection, and in the presence of the jury, the trial judge forced appellant's wife to invoke her spousal privilege. The trial judge also declined to give the jury an instruction pursuant to Rule 513(c). Thereafter, the State had admitted into evidence, over objection, a partial transcription of appellant's wife's cross-examination testimony, which contained incriminating evidence against appellant.

In its response to appellant's first and second points of error, as I understand same, the State argues that its calling appellant's wife to testify in the jury's presence, the trial judge's forcing her to invoke her spousal privilege in the jury's presence, and the trial judge admitting into evidence over objection the damaging and incriminating part of appellant's wife's cross-examination does not constitute reversible error because of Rules 804(a), 804(b)(1), 513(b), Rule 513(c), and Rule 610(b), Tex.R.Crim. Evid., all of which were in effect when appellant's trial occurred. Under the facts of this cause, I am unable to agree with the State.

All of the commentators appear to be in agreement that except when absolutely necessary an unwilling spouse should not be called by the State and required to invoke his or her privilege in the presence of the jury. "Rather, the prosecutor should first ascertain, outside the jury's presence, that the spouse will not object [to being called to testify on behalf of the State]." 2 *Weinstein's Evidence* at 505–14. See also Louiselle & Mueller, *Federal Evidence.*

The sole issue that was presented by appellant at the pretrial hearing on his motion to suppress was whether his wife's consent to search his and her residence that she gave to Linda Thompson, a member of the Aransas Pass Police Department, was voluntary. Appellant's wife's testimony on direct examination was totally limited to that issue. The State, however,

over objection, exceeded the scope of the wife's direct examination by questioning appellant's wife about many matters which I find were irrelevant to the issue of whether appellant's wife voluntarily gave her consent to Thompson so that the police could search her and appellant's trailer home without the necessity of obtaining a search warrant.

It is undisputed that appellant was married to Elaine Johnson; that appellant, Elaine, and her natural son Michael lived in the trailer home that was later searched by the police pursuant to appellant's wife's consent to search; that prior to appellant's arrest only appellant and Michael, and the family dog "Magnum," were inside of the trailer home, appellant and his wife having temporarily separated from one another, with the wife staying at a friend's residence; that after appellant was arrested, his wife gave the police her written consent to search their trailer home. It appears from the record that when appellant's wife gave Thompson her written consent to search her and appellant's residence she and appellant were not on the best of terms. However, by the time the pretrial hearing was held on appellant's motion to suppress, she and appellant had "made up."

The record reflects that at the pretrial hearing, to counter the testimony of Thompson, that appellant's wife had voluntarily given her consent to search, appellant called his wife, Elaine, to testify solely on the issue of the voluntariness of her consent to search. Elaine's consent to search was obtained after appellant was arrested by the police, and after he had refused to give the police *his* consent to search. All of appellant's wife's testimony that was adduced on direct examination at the pretrial hearing went to facts that might have demonstrated to the trial judge that her consent to search was not a voluntary act, but was obtained through mental coercion or, as one of appellant's attorneys described it, "psychological pressure." Appellant's wife was cross-examined, over objection, inter alia, about her purchasing appellant a new pair of blue jeans approximately three weeks before the murders

were committed. She was also cross-examined about her separation from appellant; about her "fight" with appellant which occurred outside of the place of business where she worked; and about certain pieces of evidence that the police had seized from her and appellant's residence pursuant to her consent to search that she gave Thompson. The testimony concerning appellant's wife purchasing appellant a pair of new blue jeans was relevant to the State's case because a pair of the same size and brand of jeans matched a pair of jeans that was later found in a dumpster that was located near appellant's residence, except the pair of jeans found in the dumpster had once been soaked in blood. An unsuccessful attempt had been made by someone to wash the blood from the jeans. I find that virtually all of the questions that the State asked appellant's wife on cross-examination at the pretrial hearing were totally irrelevant to the issue whether appellant's wife's consent to search that she gave the police was voluntarily given. Thus, appellant's objections to such questions should have been sustained, rather than overruled, by the trial judge.

Appellant's wife was cross-examined, over objection, by the prosecutor, inter alia, about her purchasing appellant a new pair of blue jeans approximately three weeks before the murders were committed. She was also cross-examined about her separation from appellant; about her "fight" with appellant which occurred outside of the place of business where she worked; and about certain pieces of evidence that the police had seized from her and appellant's residence pursuant to her consent to search that she gave Thompson.

The testimony concerning appellant's wife purchasing appellant a pair of blue jeans was relevant to the State's case because a pair of the same size and brand of jeans matched a pair of jeans that was later found in a dumpster that was located near appellant's residence, except the pair of jeans found in the dumpster had once been soaked in blood. An unsuccessful attempt had been made by someone to wash the blood from the jeans. I find that virtually all of the questions that the State

asked appellant's wife on cross-examination at the pretrial hearing were totally irrelevant to the issue whether appellant's wife's consent to search that she gave the police was voluntarily given. Thus, appellant's objections to such questions should have been sustained, rather than overruled, by the trial judge. See and compare *Nelson v. State*, 765 S.W.2d 401 (Tex.Cr.App.1989).

I find, however, that the following was properly brought out by the prosecutor during his cross-examination: In response to one of the prosecuting attorney's questions to appellant's wife at the pretrial hearing, "Are you saying that Linda Thompson forced you to sign that consent to search?," appellant's wife responded: "She told me unless I signed it they were going to get a search warrant." Appellant's wife also testified that "I told them I wanted to be there when the trailer was searched so I knew what they took out of the trailer."

It should be obvious to almost anyone that the purpose of a trial judge conducting a pretrial hearing on a defendant's motion to suppress evidence, and deciding the issue pretrial, is to enable the trial judge to avoid delays occurring during the trial. E.g., *Bosley v. State*, 414 S.W.2d 468, 470 (Tex.Cr.App.1967).

Of course, a pretrial hearing on a particular motion should only encompass relevant matters that the parties and the trial judge desire to resolve prior to trial. In this instance, the sole issue at the pretrial hearing on appellant's motion to suppress evidence was whether appellant's wife had voluntarily consented to the police searching her and appellant's residence. Any testimony on that issue would have been relevant, whether brought out on direct or cross-examination, either by the State or appellant.

I agree with the State that under the Rules of Criminal Evidence, that govern the husband-wife privilege, there is no longer the restriction that when one spouse voluntarily testifies on behalf of the other spouse, either during a pretrial hearing or at trial, his or her testimony on cross-exam-

ination is restricted to that given on direct examination. Of course, the testimony adduced on cross-examination must be relevant to an issue in the proceeding then being conducted. In fact, Rule 402, Rules of Criminal Evidence, expressly provides: "Evidence which is not relevant is inadmissible." I see no reason to make a distinction between irrelevant evidence offered at a pretrial hearing on a motion to suppress and irrelevant evidence offered at the accused's trial. Thus, irrelevant evidence should not, over objection, ever be admitted into evidence, either during a pretrial hearing or during the trial itself.

Today, I would belatedly resolve the dilemma that appellant faced in the trial court, and hold that when one spouse voluntarily testifies at a pretrial hearing on the other spouse's behalf, the testifying spouse, by so testifying, does not waive for trial purposes his or her marital privilege.

This Court has long equated the spousal privilege with the privilege of self-incrimination. In regards to the latter, this Court has held that "by testifying at a preliminary hearing, at an inquest, before a grand jury or at a previous trial one does not waive his right to claim his privilege against self-incrimination at a later trial ... Thus, it would appear that a waiver does extend beyond the particular proceeding and by voluntarily testifying at one's own trial the witness does not lose his privilege at a later proceeding." *Davis v. State*, 501 S.W.2d 629, 630 (Tex.Cr.App. 1973). See also *People v. Stufflebeam*, 19 Ill.App.3d 462, 311 N.E.2d 601, 602–603 (1974). Therefore, I would hold that appellant's wife did not, by voluntarily testifying at the pretrial hearing on appellant's motion to suppress, waive her spousal privilege not to testify against appellant at his trial. Compare, however, *Jones v. State*, 501 S.W.2d 308 (Tex.Cr.App.1973); *Rogers v. State*, 368 S.W.2d 772 (Tex.Cr.App.1963); *Thrash v. State*, 170 Tex.Crim. 97, 338 S.W.2d 447 (App.1960).

I stress that the trial judge should have sustained appellant's counsel's "irrelevant" objections that were leveled to many of the questions the prosecuting attorney asked appellant's wife on cross-examination at the pretrial hearing. Had the trial judge sustained appellant's objections, as she should have, this would have made moot appellant's second point of error.

I pause to point out that my research, nor apparently does the majority's, does not reveal anything that might reflect or indicate that when this Court adopted Rule 504(2)(a), Rules of Criminal Evidence, it intended to abolish everything that it had ever held about the husband-wife privilege.

Art. 38.11, V.A.C.C.P. (1965 Code of Criminal Procedure), as amended, which is Rule 504(2)(a)'s predecessor, previously controlled the boundaries of the husband-wife privilege. That statute expressly provided: "The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution." Prior to the enactment of Art. 38.11, supra, former Article 714, 1925 Code of Criminal Procedure, provided in part that "neither husband nor wife shall, in any case, testify as to communications made by one to the other, while married ... The husband and wife may, in all criminal actions, be witnesses for each other; but they shall in no case testify against each other except in a criminal prosecution for an offense committed by one against the other." *Rogers v. State*, 368 S.W.2d 772 (Tex.Cr.App.1963). This Court's past cases make it clear that the "husband-wife" spousal privilege, as set out in Art. 38.11, supra, as amended, was treated like it was of constitutional dimension. The cases make it appear that the spousal privilege was to be given the same dignity that the constitutional privilege of self-incrimination had been given.

Under Art. 38.11, supra, as originally worded, except for the exceptions listed within the statute, no other exceptions existed, including being called as a witness by the State against the defendant spouse where the defendant spouse had committed an assaultive offense against his, her, or their children. Art. 38.11, supra, as amended, however, provided for the following exceptions: "[A] wife or husband may volun-

tarily testify against each other in any case for an offense involving any grade of assault or violence committed by one against the other or against any child of either under 16 years of age, or in any case where either is charged with bigamy, or in any case where either is charged with interference with child custody, or in any case where either is charged with nonsupport of his or her spouse or minor child."

Under Art. 38.11, supra, "The disqualification of a spouse as an adverse witness could not be waived." *Johnigan v. State,* 482 S.W.2d 209, 210 (Tex.Cr.App.1972). "In forcing such prejudicial action to occur, the Court and the State were guilty of an injustice and committed reversible error. (Citations omitted.)" *Wall v. State,* 417 S.W.2d 59, 63 (Tex.Cr.App.1967). See also *Willard v. State,* 719 S.W.2d 595, 597 (Tex.Cr.App.1986), citing *Eads v. State,* 74 Tex. Crim. 628, 170 S.W. 145 (App.1914).

This Court has also ruled, if not expressly, at least implicitly, that the protection embraced by Art. 38.11, supra, was so fundamental that it could not be vitiated by consent, could not be lost by failure to object to its violation at trial, and it also applied to hearsay statements not objected to by the defendant. *Jones v. State,* 501 S.W.2d 308, fn. 1, 2, 3, and 4, pp. 309–311 (Tex.Cr.App.1973). The majority opinion's reliance upon much of the dictum found in *Aguilar v. State,* 715 S.W.2d 645, 649 (Tex.Cr.App.1986), to support its holding that the State's error in calling a disqualified witness to testify is subject to a harmless error analysis, is terribly misplaced.

However, the spouse's disqualification as an adverse witness to the other spouse was not without exceptions, such as testimony adduced pursuant to the res gestae exception to the hearsay rule of evidence; wife as a co-conspirator; wife as a co-defendant to the husband, if the husband was tried separately from the wife; and, where the defendant introduces part of a conversation between his wife and another, the State was entitled to introduce the remainder of the conversation on the same subject. *Jones v. State,* 501 S.W.2d 308 (Tex.Cr. App.1973). It was also incurable and re-versible error for the State, in the presence of the jury, to call the defendant's wife to testify as a witness for the State, "thereby forcing him to object in the presence of the jury, when such action was done in such a manner as to convey to the jury the impression that the wife, if allowed to testify, would rebut defensive testimony previously given in the case. (Citations omitted.)" *Johnigan,* supra, at pages 210–211. See also *Wall,* supra. Incurable and reversible error also occurred even when the defendant was *not* forced to object in the jury's presence, if the jury received *any* impression that the wife's or husband's testimony would have been adverse to the defendant. *Johnigan,* supra, at page 211. Even where the trial was bifurcated, one spouse was disqualified from testifying for the State at the punishment stage of the other spouse's trial. *Carabajal v. State,* 477 S.W.2d 640, 641 (Tex.Cr.App.1972).

Where the wife testified for the husband, or vice versa, the State was permitted to cross-examine the testifying spouse "on matters concerning which he or she testified on direct, and also as to matters that were germane and pertinent to his or her direct testimony but which were not brought out on direct examination." *Mitchell v. State,* 517 S.W.2d 282, 287 (Tex. Cr.App.1975). Thus, it was impermissible for the State to bring out incriminating evidence on cross-examination unless same was brought out either on direct examination by the defendant spouse or was germane and pertinent to the direct examination testimony. *Wiggins v. State,* 109 Tex. Crim. 195, 3 S.W.2d 811 (App.1928). Also see *Niles v. State,* 104 Tex.Crim. 447, 284 S.W. 568 (App.1926); *Branch's Ann.P.C.,* § 152, at p. 187.

Although I acknowledge that the spousal privilege is not a constitutionally guaranteed privilege, I also find that the principle of law that the Supreme Court announced in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), should be applied to this cause, as part of this State's "husband-wife" privilege. One of the issues that the Supreme Court had to resolve in *Simmons,* supra, concerned a defendant's dilemma in either testifying at

a pretrial hearing on a motion to suppress, in order to establish his "standing," or not testifying at all, thus invoking his right of self-incrimination privilege, and eliminating the possibility that his own testimony could be used to convict him at his trial, but causing him to give up his claim that he had "standing" to contest a search. The Supreme Court stated and held the following: "Thus, in this case, Garrett [one of the defendants in *Simmons*] was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, I find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Simmons v. United States*, supra, 390 U.S. at 393, 88 S.Ct. at 976.

The record in this cause is clear that in the trial court appellant was confronted with a similar dilemma as was the defendant Garrett in *Simmons v. United States*, supra. The record reflects that at the pretrial hearing on appellant's motion to suppress evidence that was obtained pursuant to his wife's consent to search, appellant was presented with two options: he could call his wife to testify in order to prove that her consent to the search was involuntarily obtained by Officer Thompson, but if he did so his wife became subject to cross-examination by the prosecutor. Although not foreseeable that the trial judge would permit the prosecutor to cross-examine appellant's wife on irrelevant matters, this was an outstanding possibility, which actually occurred. Furthermore, it was also an outstanding possibility that at trial the trial judge would admit into evidence the prosecutor's irrelevant cross-examination that had been adduced at the pretrial hearing. On the other hand, appellant could have avoided the above by choosing not to call his wife to testify at the pretrial hearing,

but this would have prevented him from producing any independent evidence that his wife's consent was involuntarily obtained.

Rule 504(2)(a) provides that "a spouse who testifies on behalf of an accused is subject to cross examination as provided by Rule 610(b)." Rule 610(b) expressly provides, however, that "a witness may be cross-examined on any matter *relevant* to any issue in the case, including credibility." (My emphasis.) Thus, the trial judge clearly erred in permitting the prosecutor to cross-examine appellant's wife about irrelevant matters. The majority opinion agrees, but then in a convoluted sort of way holds that such error was harmless to appellant. Given the facts and circumstances of the wife's being called by the State in the jury's presence, and forced not to testify in the jury's presence, and pursuant to the principle of law announced in *Simmons*, supra, and, furthermore, because I would hold that appellant's wife retained her spousal privilege at trial not to testify for the State and against appellant, I would not answer the State's contention that when appellant's wife invoked her privilege when called by the State to testify during appellant's trial, she then became *unavailable* to testify at appellant's trial. See, however, Rule 804(b)(1), Rules of Criminal Evidence.

Furthermore, by my holding that appellant's wife retained her spousal privilege not to testify against appellant at his trial, and further finding that she timely and properly invoked same when called to testify by the State at appellant's trial, the rule that "If a witness at a former trial of the same case is not available to testify at a retrial of the cause, his testimony at the former trial may be admitted," see 24 *Tex. Jur.2d*, Evidence, § 696, at page 334, is not applicable to this cause. See also McCormick & Ray, *Texas Evidence*, Second Edition, § 942 & 948.

"When a witness claims his privilege, a natural, indeed an almost inevitable, inference arises as to what would have been his answer if he had not refused to testify." *United States v. Maloney*, 262 F.2d 535

(2nd Cir.1959). In this regard, it was the State who called appellant's wife to testify at appellant's trial, with the apparent knowledge that the wife intended to invoke her spousal privilege not to testify against appellant. At this point, an inevitable inference arose that had the wife voluntarily testified, she would have done so on behalf of the State.

If the prosecutor calls a husband or wife to testify for the State, *knowing* that the spouse will invoke his privilege not to testify for the State, the prosecutor is charged with notice of the probable effect that the witness' refusal might have upon the jury's mind. In this instance, both the trial judge and the prosecution had prior notice that appellant's wife would invoke her spousal privilege not to testify for the State and against appellant.

In this regard, I point out that there is no claim by the State that appellant "opened" the door to the State calling his wife to testify against him, or that his wife "waived" her privilege not to testify against appellant. Furthermore, appellant's wife's testimony that she gave at the pretrial hearing did not constitute extrajudicial statements against appellant to others. Even if they did, I would still subscribe to the rule that hearsay statements, if objected to, are blocked by the privilege. See *Ivey v. United States*, 344 F.2d 770 (5th Cir.1965); *United States v. Williams*, 447 F.2d 894 (5th Cir.1971); 8 *Wigmore on Evidence* § 2232 (rev. McNaughton 1961); 2 Wright, *Federal Practice and Procedure* § 405 at 87 (1969).

Rule 513(b) expressly provides that "the making of claims of privilege [shall be done to the extent practicable] without the knowledge of the jury." This rule was obviously violated by the State in this cause. Rule 513(c) expressly provides that "any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom." Obviously, when the trial judge declined to so instruct the jury, she violated the terms of this rule. In *United States v. Maloney*, supra, that court held that it was "plain error" not to give such a cautionary instruction in the self-incrimination context. Also see Federal Rule 513(a) of the Federal Rules of Evidence, and 19 A.L.R.4th 368, annotation, "Propriety and prejudicial effect of prosecution's calling as witness, to extract claim of self-incrimination privilege, one involved in offense charged against accused."

Therefore, I would hold that the trial judge erred in the following particulars: permitting the State to call appellant's wife to testify against him in the jury's presence; permitting the State to cross-examine appellant's wife about irrelevant matters at the pretrial hearing on appellant's motion to suppress; and, because appellant's wife at trial still had the spousal privilege not to testify against appellant her husband, erred in admitting into evidence over objection the transcription of appellant's wife's testimony adduced on cross-examination at the pretrial hearing on appellant's motion to suppress.

Furthermore, I am unable to conclude beyond a reasonable doubt that the errors, either individually or collectively, made no contribution to appellant's conviction. See Rule 81(b), Rules of Appellate Procedure. In this regard, the majority opinion's contrary holding, that the error was harmless, supports what I registered in the dissenting opinion that I filed in *Harris v. State*, 790 S.W.2d 568, 597, 599 (Tex.Cr.App.1989). If it is the intent of the majority of this Court, in applying the provisions of Rule 81(b), as it might suit their fancy, under the "gorilla" theory, so be it. However, would it not be more responsible for a majority of this Court to rewrite Rule 81(b) so that no error can ever be harmful to the defendant?

Therefore, I respectfully dissent.