# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00082-CR

---

**Darren Latodd Houston, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 155TH DISTRICT COURT OF FAYETTE COUNTY
### NO. 2020R-154, THE HONORABLE JAMES H. SHOEMAKE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Darren Latodd Houston of assault family violence with a prior conviction and assessed his punishment, enhanced pursuant to the Texas Penal Code's habitual offender provision, at 60 years' confinement. *See* Tex. Penal Code §§ 12.42(d), 22.01(b)(2)(A). On appeal, Houston contends that the trial court abused its discretion by admitting unfairly prejudicial evidence under article 38.371 of the Texas Code of Criminal Procedure, that the court erred by failing to arraign him before the jury on the indictment's enhancement allegations during the punishment phase of trial, and that he was subjected to multiple punishments for the same offense. *See* Tex. Code Crim. Proc. art. 38.371 (allowing State in domestic-violence cases to offer evidence "of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the

offense," including "evidence regarding the nature of the relationship between the actor and the alleged victim"). We affirm the trial court's judgment of conviction.

## BACKGROUND

Houston was charged by indictment with aggravated assault with a deadly weapon and assault family violence with a prior conviction.[1] The charges arose from the September 15, 2020 assault against his partner,[2] Sandra Bahner. At trial, the State presented testimony from Bahner; her friend, Angela Heintschel; Heidi Erwin, a nurse; Jennifer Finley, a domestic-violence expert; and various members of law enforcement.

Erwin testified about Bahner's hospital visit on the morning of September 16, 2020. Bahner—who was walking slowly and appeared to be in "some distress"—entered the hospital at approximately 8 a.m. and stated that she had been assaulted. She seemed afraid, and "you could tell that she was hurting." She was "covered in bruises, big dark bruises," on her left leg and thigh, left buttock, arms, right shoulder, chest, hands, right hip and thigh, and scalp. Erwin testified that based on her training and experience, Bahner's injuries were consistent with being assaulted and that bruising from a fall is generally localized. Bahner reported that following an argument, she had been assaulted by her boyfriend from 4 p.m. on September 15th until the morning of the 16th. She stated that "she was hit over and over again with fists,

---

[1] The State abandoned a third count, continuous family violence, prior to trial.

[2] The record is ambiguous with respect to the precise nature of Bahner and Houston's relationship. On calls with her, he referred to her as his "wife" but also stated that he wanted them to marry. When asked whether they considered themselves to be married under common law, she testified that she "just assumed that's how Texas looked at it." She also testified that despite their not being "legally married," she had filed for divorce "[t]o try to recoup some of the assets in the marriage."

2

also kicked"; that "this ha[d] not happened before"; and that "she d[id] not feel safe [and] fear[ed] retribution."

La Grange Police Department (LGPD) Investigator Kenneth Schmidt testified regarding his three attempts to interview Bahner. He first met her at the hospital and observed her "severe bruising," which, in his 50 years of experience, "[r]eached very high up there . . . compared to others[' injuries]." There was no bruising to her face, however, which he testified was common in domestic-violence cases because such injuries cannot be concealed by clothing. She was "very scared" but was reluctant to talk to him.

Schmidt met with Bahner again on September 18th at the Bastrop Family Crisis Center, where the hospital had arranged for her to stay. He documented her injuries, but she remained unwilling to speak with him. He testified that the evidence in this case was "[v]ery typical" for a domestic-violence case and that her bruises were "from hitting something or something hitting her."

Their third encounter occurred on October 8, 2020, after Houston's arrest. Bahner was "very willing to talk" to Schmidt, who testified that uncooperative domestic-violence victims generally fear retaliation and believe that they can "make their own exit plan." During the interview, she disclosed additional assaults for the first time.

Following a hearing outside the jury's presence at which the trial court ruled that evidence concerning the nature of Bahner and Houston's relationship was admissible, Bahner testified about the relationship, three extraneous uncharged assaults, Houston's prior family-violence conviction, the charged offense, and his ensuing actions.

Bahner, who was 52 years old at the time of trial—12 years older than Houston, began a romantic relationship with him in April 2016. He was jealous, possessive, and

3

controlling and called and texted her "incessantly." Their relationship "didn't start out overtly abusive, but more so just with outbursts like yelling and threatening." While driving down a back road, he once warned her, "I'm going to take you and kill you and bury you up at your dad's land."

He first physically abused Bahner in August 2016. He thought that she had taken too long to shop for school supplies and struck her in the side of the face, causing her to fall to the floor. She did not know if she lost consciousness. She went with her children to her mother's house, and he followed. He asked to talk in his car, and she got in to "calm the spectacle." He then drove her around for approximately an hour and told her "that it would be easy for him to beat [her] up and throw [her] in a ditch and leave [her] there." She did not call the police following the incident because she did not want to upset her mother, and Houston promised that "it would never happen again."

Following the August 2016 assault, Child Protective Services (CPS) began an investigation involving Bahner's children, and she was uncooperative. During the investigation, Houston "decided he wanted to teach [Bahner's son] a lesson to get [him] blamed for something he didn't do." At Houston's direction, she placed drugs in her son's backpack and called the school, leading to his arrest.[3]

The offense underlying Houston's prior terroristic threat family violence conviction, which was used for enhancement, occurred on October 28, 2016. While at work, Bahner's manager asked whether Bahner was in an abusive relationship. She replied that she was, and they called the police. Houston learned of the 911 call and left Bahner a voicemail

_____

[3] In May 2017, Bahner pleaded guilty to retaliation and was placed on deferred adjudication for five years.

4

informing her that he was in jail. However, when she got home around 10 p.m., he "ambushed" her from a hiding place by her bedroom door. He forced her to record a confession to planting drugs in her son's backpack and told her that he was "getting insurance." If she did not do as Houston wanted during the assault, he hit her on the arms and legs.

The assault eventually escalated, and he wrapped his hand in a towel and began hitting her head, stating that he did not want to leave a mark. He also choked her and told her that he was going to kill her. The assault "went on all night." When he left to get breakfast the following morning, she and her daughter fled to a neighbor's house, where Bahner called the police. Officers photographed her injuries and recorded a phone call between her and Houston, in which he repeatedly apologized and stated that he was "not acknowledging the fact that [he] was angry to that point," that he was "wrong," and that "time [was] going to give [her] a chance to forgive [him]."

Bahner remained in contact with Houston while he was in jail following the assault, and—at his insistence that he had not been at her house that night—began to "question herself." She completed two sworn affidavits of non-prosecution in which she attested that he had not harmed her or held her against her will, that he did not deserve to be "locked up on false charges," and that it was "more [her] fault, for over[]reacting." Houston, who had initially been charged with a felony, pleaded guilty to misdemeanor terroristic threat family violence.

Over the next few years, Bahner and Houston did not live together but continued their relationship and spoke every day. In April 2020, he moved back into her house, and although "[t]hings seemed to be really good," the physical abuse resumed during a trip to Louisiana for her mother's funeral when he "backhanded" her face because he did not think that

she was helping enough with directions.  After they returned home, "[a]ny little thing would set him off," and he began looking through her old phones for signs of infidelity.

In August 2020, Bahner and Houston stopped at a truck stop in Quanah, Texas, while returning from a trip to Colorado.  Houston spoke by phone with his father, who told him to "[b]eat that white bitch's ass."  Houston struck her in the face, forced her into the backseat, and hit her hip and head.  Her left hip was "really swollen and bruised," and she had a "little bit of a black eye."  Following the assault, he emptied a bank account on which she had put his name.

In the days leading up to the charged assault on September 15, 2020, Houston was angry that Bahner had not adequately defended him to her friend, Heintschel, and accused Bahner of writing a love letter to an ex.  Houston told her that he was going to hit her hip, which was still bruised from the Quanah assault; that he "could be here all day"; and that he was "going to make it where [she did]n't walk again."  To defuse the situation, she drove him to Heintschel's house to "let [him] hear that [she was] defending [him]," but Heintschel "didn't know what was going on" and called the police, leading Bahner and Houston to leave.

When they arrived home around 4 p.m., he began assaulting her and did not stop until early the next morning.  He told her that he was going to hit her in the hip each time that she said something that he did not believe and forced her to stand between blows.  He hit her "as hard as he could" with his fists on her arms, hips, and chest and kicked and "stomped [her]" with his foot.  Afterward, he brought her ice packs while she sat in the bathtub.  In the early hours of September 16th, he stated, "I just can't do this anymore," and ordered her to pack his bags.  She placed his things on the back porch and because he had punched her in the chest "to where . . . it was hard for [her] to breathe," she left for the hospital.  Her hips "were huge and swollen and

6

black," and she could barely walk. Later that day, Houston called and texted her to profess his love and assert that she must love him too because she had not gone directly to the police.

On October 5, 2020, she drove from Richmond, Texas—where she had been living after the assault—to La Grange "to tie up a lot of loose ends." Houston called her to say that he was in her house and refused to leave. The police were called, and he was arrested. On February 10, 2021, she obtained a temporary protective order against him, which was later extended. On February 18, 2021, he appeared at her house uninvited, threatened her daughter, and was shot by a man outside the house.[4]

On cross-examination, she testified that she had searched Houston's truck near the courthouse during a proceeding in their divorce case. She also testified that she had previously lied, including in her sworn affidavits of non-prosecution.

Angela Heintschel testified about her observations of Bahner and Houston's relationship. When the couple resumed living together in 2020, Bahner became distant, seemed "to lose her identity as a person," and began avoiding Heintschel, who recognized parallels to her own experience with an abusive relationship. Before the September assault, Bahner called Heintschel and demanded that she apologize to Houston for calling the police on him, which Heintschel testified she had not done. Heintschel could hear him angrily shouting in the background. She encountered Bahner twice on September 14th: when Bahner came to her work and made "accusations that weren't true" and that evening when Bahner came to her house and again demanded that she apologize.

---

[4] Bahner testified that no one had been convicted for the shooting and that both Houston's half-brother and her daughter's ex-boyfriend were suspects. Bahner had inherited the gun used in the shooting from her father.

LGPD Chief Charles David Gilbreath testified that he became aware that following the September assault, Houston was going to Bahner's house, which concerned Gilbreath because of "the amount of abuse that she had suffered." Gilbreath also testified that he was present for Houston's arrest. When Bahner reported on October 5, 2020, that Houston was at her house, Gilbreath responded and saw him run from the garage. Officers pinged Houston's phone and discovered him hiding in a nearby yard.

LGPD Officer Garrett Durrenberger testified that in November 2016, Houston, an inmate in the Fayette County Jail, confessed to placing the drugs in Bahner's son's backpack. Durrenberger testified that Houston told him that he believed at the time that the son had reported him to CPS and that Houston was upset at being the subject of a CPS investigation.

Various jail calls made by Houston in October 2020 were admitted into evidence. On the calls, he admitted to hitting Bahner but insisted that he had done so in another state:

> I can prove that this shit happened in Pueblo, Colorado. So this bitch charging me with a crime that happened in a whole other state. Yes she went to the hospital in this state, but the actual incident didn't even happen in Texas[]. I promise it didn't. You know what I'm saying? That's why even some of them bruises don't even – they look like they was already starting to go into the healing phase. You feel me? Because it was like three days later.

Elsewhere, Houston took issue with the indictment's allegation of a deadly weapon:

> That's why when it was thought it was a DV, a n**** wasn't tripping, but then when they started talking all this aggravated assault shit, that's when a n**** went into panic mode because a n**** ain't committed no aggravated assault with weapons. Then they said it's a – they're saying a fisticuff is a weapon. Like they're saying your fist is a weapon. I'm like, "Oh, no. This is new to me. Like oh, no. We ain't fixing to do this. We ain't fixing to do this." Like just a regular fist is a weapon. That's a weapon. That's an aggravated weapon. Like what the

fuck you just say?  We had a fight.  It wasn't lopsided; it was a fight.  You feel me?  They're trying to say I'm just delivering punishment.  We had a fight.

Similarly, Houston stated

I didn't beat her, and she didn't got nothing on her face; it was on her shoulders and her thighs.  That's the genuine truth because we was laying down in the back of the truck.  We got in a fight like that – and I'm admitting that, and I'm not taking nothing from that, but all of this aggravated shit?  Like no, I did not hit my wife in the face.  I did not choke her.  I did not pull her hair.  Like we just had a little tussle in the back.  No, no, no, no, no.  You are not fixing to [indistinct] with an aggravated charge.

Jennifer Finley, a services coordinator at the Bastrop Family Crisis Center, testified as a domestic-violence expert.  She testified with reference to the "power-and-control wheel" model of domestic violence that controlling behaviors can include monetary theft, refusing to leave a residence, "constant unwanted communication," violating a protective order, going through a partner's phone, and gaslighting.  The "end game" of control is "[t]o keep power over this person."  Finley testified that recanting abuse allegations "is very common for women" and that psychological or emotional dependency may develop between an abuser and a victim.

Houston was not present for the jury's verdicts acquitting him of aggravated assault with a deadly weapon and convicting him of assault family violence with a prior conviction.  Following the punishment phase, which he did not attend, the jury found that the three enhancement allegations in the indictment were true and assessed his punishment at 60 years' confinement.  This appeal followed.

## DISCUSSION

Houston contends (1) that the trial court abused its discretion by admitting unfairly prejudicial evidence of the nature of his and Bahner's relationship, (2) that the court

erred by not having him enter a plea to the enhancement allegations before the jury during the punishment phase, and (3) that he was subjected to multiple punishments for the same offense in violation of the United States Constitution's Double Jeopardy Clause.

## I.     Rule 403

In his first issue, Houston contends that the "trial court abused its discretion in admitting extraneous nature-of-relationship evidence during guilt-innocence over [his] Rule 403 objection." *See* Tex. R. Evid. 403 (allowing trial court to exclude otherwise admissible evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence"). Specifically, he asserts that the trial court improperly admitted evidence that he

- was "extremely controlling, jealous, [and] manipulative";

- "isolated [Bahner] from family and friends";

- "would follow her, check up on her, call and text her incessantly";

- "verbally abused her[,] including name calling, yelling, accusing her of cheating, threatening to kill her, intimidate[ing] her, criticiz[ing] her";

- committed "various assaults that . . . were not reported to the police," including one in August 2016 and two more in August 2020;

- committed "an assault" that formed the basis of his terroristic threat conviction;

- "concocted a scheme to plant drugs" on Bahner's son;

- threatened to kill Bahner;

- took $50,000 from her bank account; and

- showed up at her residence in Fort Bend County in 2021, where he was shot.

10

The State argues that Houston's claim is unpreserved or without merit.

## A.     Preservation

Preservation of error is a systemic requirement on appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (citing *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005)). If an issue has not been preserved for appeal, we should not address the merits of that issue. *Id.*

To preserve a complaint for appellate review, there must ordinarily be a timely, specific objection and a ruling by the trial court. Tex. R. App. P. 33.1(a). "To be timely, a complaint must be made as soon as the grounds for complaint [are] apparent or should be apparent." *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999). To be sufficiently specific, an objection need not employ "hypertechnical or formalistic . . . words or phrases," *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018); "magic words," *Ford*, 305 S.W.3d at 533; or a citation to a particular statute, *Laws v. State*, 640 S.W.3d 227, 229 (Tex. Crim. App. 2022) (quoting *Ford*, 305 S.W.3d at 533). Rather, the objecting party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *see Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). "This gives the trial judge and the opposing party an opportunity to correct the error." *Pena*, 285 S.W.3d at 464 (citing *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005)).

The complaint on appeal must also comport with the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *see Broxton v. State*, 909 S.W.2d

11

912, 918 (Tex. Crim. App. 1995) ("An objection stating one legal theory may not be used to support a different legal theory on appeal." (quoting *Johnson v. State*, 803 S.W.2d 272, 292 (Tex. Crim. App. 1990), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681, 685 n.6 (Tex. Crim. App. 1991))). When it does not, nothing is presented for review. *Williams v. State*, 191 S.W.3d 242, 255 (Tex. App.—Austin 2006, no pet.); *see Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). In determining whether an issue on appeal comports with a trial objection, "we look to the context of the objection and the shared understanding of the parties at the time." *Clark*, 365 S.W.3d at 339 (citing *Lankston*, 827 S.W.2d at 911).

At a hearing on the admissibility of the article 38.371 evidence, held outside the jury's presence, the State announced an intent to admit evidence

> to basically show broadly [Houston wa]s controlling, that he was extremely controlling, jealous, manipulative. He isolated [Bahner] from family and friends. He would follow her, check up on her, call and text her incessantly, verbally abused her including name calling, yelling, accusing her of cheating, threatening to kill her, intimidated her, criticized her.
>
> He had her add him to her bank accounts because she had gotten a large inheritance from her family. She also bought cars for him that were later placed in his name, and then there were various assaults that occurred that were not reported to the police.

The State noted that it anticipated evidence of assaults occurring in August 2016 and on October 29, 2016; August 20, 2020; August 24, 2020; and September 1, 2020.

Referencing Rule 403, defense counsel stated that he believed the jury would be "confused . . . by of all this." He explained that he "want[ed] to try [his] best to limit the events," that he did not "have a problem" with evidence that Houston was controlling,[5] that his "first

---

[5] Defense counsel later assented when the trial court asked whether the parties agreed on the "control issues."

12

complaint to all the 2016 factors [was] remoteness," and that the State had no need for the August 2016 assault because "the State's case against Mr. Houston is overwhelming." Counsel clarified that he was not objecting to evidence concerning the October 2016 assault, which formed the basis for Houston's prior conviction for terroristic threat family violence, but that he objected to "going into how the relationship began and obviously started to go bad and specific events other than the terroristic threat." He elaborated

> The problem is it's been so long ago. There's little evidence of it, if any, other than the conviction, and the jury will have to – even with the limiting instruction would have to be told if you believe beyond a reasonable doubt that any of these things happened, then you can only consider it for the limited purpose of putting this thing into context. It's not needed. The story and the case can be tried faster and cleaner and proven beyond a reasonable doubt without any of that information.
>
> So under 403, the first thing – the tension is the probative value versus the chances of unfair prejudice and all of the other reasons for exclusion. So we must first analyze the probative value.

Counsel requested that the parties "just talk about the most recent incidents and not go down that rabbit trail on 2016." However, he also objected that the jury would not be able to find that Houston committed the uncharged 2020 assaults beyond a reasonable doubt. The trial court overruled counsel's "objection to the evidence," and counsel obtained "a running objection to the 38.371 evidence regarding the 2016 conduct, the 2020 conduct."

We first note that defense counsel expressly declined to object to Houston's controlling behavior or conviction for misdemeanor terroristic threat stemming from the October 28, 2016 assault. Although counsel objected to the 2020 assaults, his objection was to the State's ability to prove the conduct beyond a reasonable doubt, not that the assaults were excludable under one of the bases listed in Rule 403. Thus, his objection before the trial court with respect

13

to those assaults does not comport with his argument on appeal, and nothing is preserved for appellate review. *See Clark*, 365 S.W.3d at 339; *Williams*, 191 S.W.3d at 255.

While counsel specifically objected to the August 2016 assault, if the remaining items in Houston's list on appeal—the scheme to plant drugs on Bahner's son, death threat, theft from Bahner's account, and appearance at her residence in 2021—were objected to at the hearing, the objections were made only as part of counsel's blanket objection to "going into how the relationship began and obviously started to go bad and specific events other than the terroristic threat"—seemingly an objection to the admission of *any* evidence under article 38.371. Such an objection is insufficiently specific to preserve error. *See* Tex. R. App. P. 33.1(a); *Fierro v. State*, 706 S.W.2d 310, 318 (Tex. Crim. App. 1986) ("A general objection preserved nothing for review and is not sufficient to apprise the trial court of the complaint urged."); *Wood v. State*, 516 S.W.2d 667, 670 (Tex. Crim. App. 1974) (finding objection was not specific because it did "not specify which extraneous offenses [appellant] was referring to," and he "testified to several"); *cf. Hernandez v. State*, 599 S.W.2d 614, 617 (Tex. Crim. App. 1980) (op. on reh'g) (explaining that when evidence is admitted, part of which is admissible and part of which is not, it is incumbent on objecting party to specifically point out what part is inadmissible to preserve alleged error).

Accordingly, of the items that he lists, Houston has preserved error under Rule 403 solely with respect to the uncharged August 2016 assault.

### B.   Admissibility of August 2016 Assault

We review a trial court's decision to admit evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *see also Dabney v. State*,

14

492 S.W.3d 309, 316 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *Henley*, 493 S.W.3d at 83. We review a ruling on the admissibility of evidence "in light of what was before the trial court at the time the ruling was made," *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000), and the ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

The admission of evidence under article 38.371 is subject to the Rules of Evidence. *See* Tex. Code Crim. Proc. art. 38.371(b). Under Rule 403, a trial court may exclude otherwise admissible evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Probative value" means more than relevance; rather, it "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Unfair prejudice" refers to a "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*; *see Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798, 806

15

(Tex. Crim. App. 2010). Under the Rule, trial courts have "considerable freedom in evaluating proffered evidence's probative value in relation to its prejudicial effect," and there should be "a corresponding reluctance on the part of an appellate court to reverse trial court decisions which admit or exclude evidence." *Montgomery*, 810 S.W.2d at 378.

In conducting a Rule 403 analysis, the trial court must balance the claimed probative force of the proffered evidence along with the proponent's need for the evidence against

> (1) any tendency of the evidence to suggest that the case would be decided on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Henley*, 493 S.W.3d at 93 (citing *Gigliobianco*, 210 S.W.3d at 641–42). These factors may blend together in practice. *Gigliobianco*, 210 S.W.3d at 642.

   i.  Inherent Probative Value

"[E]vidence regarding the nature of a family or dating relationship can play an important role in domestic violence cases." *Valdesgalvan v. State*, 664 S.W.3d 407, 413 (Tex. App.—Fort Worth 2023, no pet.). In particular, evidence of prior incidents of abuse is probative because it contextualizes the nature of the relationship and may help explain some of a victim's conduct during an incident or hesitancy in reporting an offense. *See Brickley v. State*, 623 S.W.3d 68, 81 (Tex. App.—Austin 2021, pet. ref'd). Such acts likewise "assist the jury in determining [if the defendant] committed the assault, whether by illustrating [his] motives (jealous paranoia and control), by shedding light on the relationship's dynamics, by establishing

16

identity, or by allowing the true version of events to shine through when [the victim] changed her story." *Rodriguez v. State*, 678 S.W.3d 375, 387 (Tex. App.—Dallas 2023, pet. ref'd). As well as prior abuse, evidence held admissible under Article 38.371 has included proof that explains why a complainant of domestic violence is unwilling to cooperate with the prosecution or that confirms the victim's initial—and later recanted—statements to police. *Id.* at 386.

Evidence of Houston's previous assaults, including the assault in August 2016, helped the jury understand why Bahner remained with him before the charged offense, why she stayed in communication with him after, why she was reluctant to speak with law enforcement or disclose the full extent of the abuse prior to his arrest, why she made two sworn affidavits of non-prosecution, why she was unwilling to cooperate with CPS, why she planted drugs in her son's backpack, and why she exhibited unusual behavior toward Heintschel prior to the charged assault.

Although the August 2016 assault occurred four years before the charged offense, and "logically, the passage of time allows things and people to change," remoteness is "but one aspect of an offense's probativeness" and alone "is not sufficient to render an extraneous offense excludable under Rule 403." *Gaytan v. State*, 331 S.W.3d 218, 226–27 (Tex. App.—Austin 2011, pet. ref'd). Moreover, courts have found extraneous offenses to be probative after far longer lapses in time. *See Corley v. State*, 987 S.W.2d 615, 617, 621 (Tex. App.—Austin 1999, no pet.) (concluding that crime that occurred thirteen years before trial was not too remote); *Luna v. State*, 687 S.W.3d 79, 103 (Tex. App.—Eastland 2024, pet. ref'd) (holding that trial court did not abuse its discretion by admitting under article 38.371 extraneous incidents of violence that occurred 12–17 years before charged offense); *Cabello v. State*, No. 13-19-00341-CR, 2022 WL 3451368, at *22 (Tex. App.—Corpus Christi–Edinburg Aug. 18, 2022, no pet.) (mem. op., not

17

designated for publication) (concluding that remoteness of article 38.371 extraneous offenses, oldest of which occurred at least 16 years before charged offense, "did not render the probative value of this evidence so weak as to render this evidence inadmissible"). Further, evidence showing a "continuing course of conduct" can militate against a finding that an extraneous offense was too remote to be probative. *Brickley*, 623 S.W.3d at 81. The trial court here concluded that because Houston was incarcerated between the 2016 and 2020 assaults, "that's like a timeout, you know. The game still is being played."

For the above reasons, this factor weighs in favor of admission.

ii.     State's Need for the Evidence

The State had ample need of the article 38.371 evidence, including the August 2016 assault. Without it, the trial would largely have come down to Bahner's word against Houston's as to the cause of her injuries. There were no eyewitnesses to the offense, and the evidence that he assaulted her consisted principally of her statements and testimony. Defense counsel raised the defensive theory of fabrication and challenged Bahner's credibility in voir dire when he questioned veniremembers about their familiarity with the case of a University of Texas basketball coach falsely accused of domestic violence and asked who among the panel had asked themselves with regard to Houston, "I wonder what he's falsely accused of?" *See Dabney*, 492 S.W.3d at 318 (recognizing that defensive theory may be raised in voir dire); *see also McDonnell v. State*, 674 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (determining that "evidence of [defendant]'s other bad acts, including prior assaults and threats against [victim], was particularly relevant here where the credibility of the witnesses was a central issue in the case" and that State's "need for the evidence was increased by evidence"

18

that victim, "despite her allegation of assault," continued to associate and communicate with defendant).

Although the State had other evidence of Houston's guilt, including his recorded statements and photographs of Bahner's extensive bruising, the article 38.371 evidence was nevertheless necessary to explain why Bahner had previously recanted allegations against Houston and been uncooperative with CPS and law enforcement. *See Rodriguez*, 678 S.W.3d at 387 ("Even though the State had other evidence in favor of its case, the extraneous offenses nonetheless had significant probative value in the absence of other eyewitnesses to illuminate the nature of Catherine's relationship with Rodriguez."). The State's need was also heightened by her weakness as a witness, owing to her involvement with drugs, CPS history, and having had her son wrongfully arrested.

For these reasons, this factor weighs in favor of admission.

iii.    Tendency of the Evidence to Confuse, Distract, or Be Given Undue Weight

Any tendency of the evidence to suggest a decision on an improper basis was mitigated by the fact that the August 2016 assault—in which Houston struck Bahner on the side of the face and caused her to fall down—was less serious than the assault on September 15, 2020. *See Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd). Bahner's testimony concerning the 2016 assault was not scientific or technical, was relevant to whether Houston committed the charged offense, and pertained to matters including victim credibility that could be easily comprehended by laypeople. *See Gaytan*, 331 S.W.3d at 228; *Deggs v. State*, 646 S.W.3d 916, 927 (Tex. App.—Waco 2022, pet. ref'd). Moreover, the trial court provided limiting instructions for the article 38.371 evidence both at the time of Bahner's

19

testimony and in the court's guilt-innocence charge. *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) ("[T]he impermissible inference of character conformity can be minimized through a limiting instruction."); *Reed v. State*, 680 S.W.3d 620, 627 (Tex. Crim. App. 2023) ("We generally presume that the jury followed the trial court's instructions."). These factors weigh in favor of admission.

### iv. Likelihood That Evidence Will Be Too Time-Consuming or Repetitive

This factor concerns whether "the jury would be distracted from consideration of the charged offense." *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005). We consider only time spent developing the evidence and exclude jury arguments and hearings outside the presence of the jury. *Dennis v. State*, 178 S.W.3d 172, 181 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Testimony concerning the August 2016 incident constituted approximately eight pages of an approximately 584-page trial transcript. *Cf. Lane*, 933 S.W.2d at 520 (concluding that factor weighed in favor of admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony); *Robisheaux*, 483 S.W.3d at 221 (finding that factor weighed in favor of admission where article 38.371 extraneous-offense evidence came in through one witness, guilt-innocence phase lasted three days, and relevant testimony "was only eight pages long"). Thus, this factor weighs heavily in favor of admission.

### v. Summation

Given our standard of review, the presumption in favor of admissibility, and the resolution of the factors discussed above, we conclude that the trial court did not abuse its

20

discretion by admitting evidence concerning the August 2016 assault.  We overrule Houston's first issue.

## II.     Failure to Receive Pleas to Enhancements

In his second issue, Houston contends that "[t]he trial court erred in not requiring the State to correct its failure to arraign [him] on the enhancement paragraphs."  We understand him to argue that the State violated article 36.01 of the Texas Code of Criminal Procedure, which mandates that allegations of prior convictions "for purposes of enhancement only" not "be read until the hearing on punishment" and that a defendant be allowed to enter a plea to the allegations before the jury at that time.  *See* Tex. Code Crim. Proc. art. 36.01(a)(1), (2).  The State responds that the issue was not preserved or, alternatively, is without merit.

Although Houston was arraigned on the charges in this case, he did not enter a plea to the three convictions alleged in the "Habitual Offender Enhancements" portion of the indictment because he voluntarily absented himself from the courtroom during guilt-innocence deliberations and never returned.  He could not be located, and a warrant was issued for his arrest.  The trial continued, and judgment forms for the prior convictions were admitted into evidence.  Neither side objected to the trial court's punishment charge, which instructed that Houston had pleaded not true to the enhancement allegations.  The following exchange occurred during the charge conference:

> THE STATE: Judge, we were doing the changes as we were going along if the Defense wants to double-check our work.
>
> DEFENSE COUNSEL: Let me have one moment, please, and look at my notes.
>
> THE COURT: Sure.  Was part of the agreement to withdraw the plea of true?
>
> THE STATE: He never got arraigned on the enhancement paragraphs.

21

THE COURT: I understand. That makes a lot of sense.

. . . .

DEFENSE COUNSEL: The defense has examined the charge, and we have no objection.

The jury found the allegations to be true and assessed Houston's punishment at 60 years' confinement.

"It has long been the rule that the reading of the enhancement allegations and the entry of the defendant's plea thereon are mandatory, and that no issue is joined between the State and the defendant with respect to the defendant's prior criminal record if this is not done." *Mendez v. State*, 212 S.W.3d 382, 388 (Tex. App.—Austin 2006, pet. ref'd) (citing *Turner v. State*, 897 S.W.2d 786, 788 (Tex. Crim. App. 1995); *Welch v. State*, 645 S.W.2d 284, 285 (Tex. Crim. App. 1983)). "It is error to permit the jury to consider enhancement evidence admitted before the entry of the defendant's plea," *id.*, and when "the charging instrument was not read at all, the remedy on appeal is a new trial, since, in such a case, none of the evidence was properly before the jury," *Phi Van Do v. State*, 634 S.W.3d 883, 892 (Tex. Crim. App. 2021). "The purpose of this rule is 'to inform the accused of the charges against him and to inform the jury of the precise terms of the particular charge against the accused.'" *Turner*, 897 S.W.2d at 788 (quoting *Warren v. State*, 693 S.W.2d 414, 415 (Tex. Crim. App. 1985)). "Error in connection with the State's failure to timely join issue on an allegation in the charging instrument is treated as trial error, not as an insufficiency of the evidence." *Phi Van Do*, 634 S.W.3d at 891. The error is not the late reading of the enhancement allegation but "the introduction of evidence before the charging instrument or punishment allegation was read." *Id.* at 891–92.

Although Houston agrees that he did not object to the error, he asserts on appeal that his "right to be arraigned was a waivable-only right that was not forfeited by his failure to object" because "1) the right is part of the right to trial by jury; 2) art. 36.01 is mandatory; and 3) correction of error is obligatory once it is brought to the court's attention." We disagree and conclude that the issue was not preserved on appeal.

First, the requirements in article 36.01(a)(1) and (2) are non-constitutional and not part of the right to trial by jury. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (expressly excluding "the fact of a prior conviction" from constitutional right to jury trial); *Oliva v. State*, 548 S.W.3d 518, 529 (Tex. Crim. App. 2018) (recognizing that article 36.01 is non-constitutional); *Boening v. State*, 422 S.W.2d 469, 473 (Tex. Crim. App. 1967) (explaining that "arraignment, not being a part of trial by jury, is for the purpose of reading the indictment to the accused, hearing his plea thereto and fixing his identity"); *Linton v. State*, 15 S.W.3d 615, 620 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (noting that "the failure to read enhancement paragraphs and a defendant's plea to the jury is statutory error").

Second, while Houston is correct that the Court of Criminal Appeals in *Turner* reaffirmed that "the reading of the enhancement paragraphs at the penalty stage in a bifurcated trial and the entering of a plea thereto are mandatory" and held that a violation of article 36.01 is not subject to harmless error analysis, 897 S.W.2d at 788, it did not directly address the correctness of this Court's finding that the "reading of the charging instrument is a right that must be implemented in the absence of an express waiver," *Turner v. State*, 860 S.W.2d 147, 150 (Tex. App.—Austin 1993), *rev'd on other grounds*, 897 S.W.2d 786 (Tex. Crim. App. 1995).

Since *Turner*, both the Court of Criminal Appeals and this Court have repeatedly recognized that violations of article 36.01 may not be raised for the first time on appeal. *See*

*Cantu v. State*, 939 S.W.2d 627, 646 (Tex. Crim. App. 1997) ("[A]ppellant waived any error by his failure to object to the procedure used by the trial court in its entering of his plea before the jury.");[6] *Mendez*, 212 S.W.3d at 387–88 ("*Welch*, 645 S.W.2d at 285, makes it clear that an objection at any point during the penalty stage is sufficient to preserve the error . . . . Mendez did all that was required to preserve this error for appeal and that no further objection was necessary."); *Macias v. State*, No. 03-19-00098-CR, 2020 WL 2048254, at \*3 (Tex. App.—Austin Apr. 29, 2020, no pet.) (mem. op., not designated for publication) ("Macias failed to raise his alleged [article 36.01] error with the district court and thus failed to preserve any such error for our review."); *Chavez v. State*, No. 03-11-00624-CR, 2013 WL 490928, at \*5 (Tex. App.—Austin Feb. 6, 2013, no pet.) (mem. op., not designated for publication) ("[A] specific trial objection is necessary to preserve [article 36.01] error for appellate review."); *Yeakley v. State*, No. 03-09-00584-CR, 2011 WL 677391, at \*6 (Tex. App.—Austin Feb. 25, 2011, pet. dism'd) (mem. op., not designated for publication) ("In light of cases decided subsequent to *Turner*, we can no longer say that an article 36.01 violation may be raised for the first time on appeal.").

In *Marshall v. State*, which involved a purported failure to read and take defendant's plea to enhancements that were alleged in a document other than the indictment, the Court of Criminal Appeals explained

> If the enhancements are in the indictment and the state does not abandon them, the defendant is on notice that the state is still seeking a greater penalty range. Here, however, the notice of intent to seek a greater penalty was in a separate document of a kind not usually read to a jury. In such circumstances, the failure

---

[6] Although Houston attempts to distinguish *Cantu* by emphasizing that the appellant's complaint was that he or his attorney—and not the trial court—should have entered his plea before the jury, he does not explain why certain alleged violations of article 36.01's "mandatory" provisions should require objections to be preserved and others should not. *Cantu v. State*, 939 S.W.2d 627, 645–46 (Tex. Crim. App. 1997).

> to read enhancement allegations does not put a defendant on notice that the proceedings may have gone amiss and thus no objection is required.

185 S.W.3d 899, 903 (Tex. Crim. App. 2006). And even under the circumstances in that case, the Court found that defendant should have objected "when the jury charge was read and it became abundantly clear that the state was asking for enhancement far beyond that specified in its notice to appellant." *Id.*

Third, Houston's argument that "the right is waivable-only" because "correction of the error is obligatory once it is brought to the court's attention" ignores the fact that in the cases to which he cites in support of his proposition, *Mendez* and *Welch*, it was through an objection that the alleged error was raised before the trial court. *See* Tex. R. App. P. 33.1(a); *Johnson*, 803 S.W.2d at 292 ("[T]o preserve error for appellate review, . . . the party alleging error must have informed the trial court as to his complaint by making a timely objection so that the trial court was given an opportunity to rule on the complaint."). In *Mendez*, the State argued that the appellant had failed to preserve error because he did not object when a witness testified at punishment but rather waited until after the State rested. 212 S.W.3d at 387–88. We disagreed and noted that because the alleged violation was "brought to the attention of the trial court and the State at a time when it was possible to correct the error," "no *further objection* was necessary." *Id.* at 388 (emphasis added). Similarly, in *Welch* the Court of Criminal Appeals found that "[t]he testimony of Woody, having been presented before appellant's plea and not having been stipulated or reintroduced, was not properly before the jury, and appellant's objection was sufficient to point out this defect to the trial court." 645 S.W.2d at 286. We do not accept Houston's conclusion that because the Court stated that an objection was "sufficient," no objection was required.

Regardless, the record in this case demonstrates that no alleged violation of article 36.01 was in fact brought to the trial court's attention. Instead, while reviewing the jury charge, the State merely advised the court that Houston, who was not present for the punishment phase, had not been arraigned on the enhancement paragraphs. The court noted that "[t]hat makes a lot of sense," and defense counsel stated that he had no objection to the charge, which instructed the jury that Houston had pleaded "not true" to the enhancement allegations.

Because Houston did not object to the State's failure to receive his pleas, he has not preserved his second issue for appellate review, and we therefore overrule it. *See* Tex. R. App. P. 33.1(a).

## III.    Double Jeopardy

In his third issue, Houston contends that the United States' Constitution's Double Jeopardy Clause was violated when the jury acquitted him of aggravated assault with a deadly weapon and convicted him of assault family violence with a prior conviction because the two counts "are carbon copies of one another for purposes of *Blockburger v. United States*, 284 U.S. 299, 304 (1932)."

The Fifth Amendment's Double Jeopardy Clause provides that "[n]o person shall be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "The Double Jeopardy Clause provides three types of protection: 1) protection against a second prosecution for the same offense following an acquittal; 2) protection against a second prosecution for the same offense following a conviction, and 3) protection against multiple punishments for the same offense." *Kuykendall v. State*, 611 S.W.3d 625, 627 (Tex. Crim. App. 2020). Houston asserts that the "third protection, against multiple punishments,

26

is the double-jeopardy issue in this case."[7]   The State argues in response that the issue is unpreserved or, alternatively, that double-jeopardy protections are not implicated in this case.

A multiple-punishment double-jeopardy claim may be forfeited if a defendant does not properly preserve it. *Langs v. State*, 183 S.W.3d 680, 686 (Tex. Crim. App. 2006). To do so, the defendant must make such an objection at or before the time the charge is submitted to the jury. *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). However, because of the "fundamental nature of double jeopardy protections," a double-jeopardy claim may also be raised for the first time on appeal "when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *Id.*

We agree with the State that Houston did not make a multiple-punishments objection before the trial court and that there is no double-jeopardy violation clearly apparent from the record, which is controlled by the Court of Criminal Appeals' decision in *Hernandez v. State*:

> Hernandez argues that this Court on original submission failed to give effect to the jury's acquittal of the family-violence-by-strangulation count when we upheld the aggravated-assault-with-a-deadly-weapon conviction based upon the same conduct for which Hernandez was acquitted. We are not persuaded. Hernandez appears to assert a multiple-punishments claim, but there is no multiple-punishment problem here because Hernandez was convicted of only one

---

[7] Elsewhere, however, Houston asserts that the violation arose from "charging [him] in the same trial" with the two counts because "acquittal as to Count 1 is essentially an acquittal of Count 2." To the extent that he intends to raise a successive-prosecution violation, his claim is without merit. *See Ex parte Hawkins*, 6 S.W.3d 554, 558 (Tex. Crim. App. 1999) ("There was no issue of successive prosecutions because the defendant was convicted of two offenses in one trial."); *Cervantes v. State*, 815 S.W.2d 569, 573 (Tex. Crim. App. 1991) (concluding that "the issue in this cause is limited to whether appellant was subjected to multiple punishments for the same offense in violation of the Double Jeopardy Clause" because "appellant was subjected to only one trial").

offense—aggravated assault with a deadly weapon—consequently, he could not have been punished for the same conduct twice.

. . . .

Hernandez's real complaint seems to be that the jury reached inconsistent verdicts . . . . But, if a defendant is acquitted of one count and convicted of another based on the same evidence in a single trial, the defendant cannot rely on the inconsistent verdicts to attack the defendant's conviction.

556 S.W.3d 308, 331 (Tex. Crim. App. 2017) (op. on reh'g). Accordingly, we overrule Houston's third issue.

## CONCLUSION

Having overruled all of Houston's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed: July 3, 2024

Do Not Publish

28